[20071.  In Bank.—March 26, 1886.]

THE PEOPLE, RESPONDENT, *v.* UZZA F. FRENCH, APPELLANT.

CRIMINAL LAW—MURDER—WITNESS—CONTRADICTORY STATEMENTS—EVIDENCE. — In a prosecution for murder, a witness for the defense who testifies on his direct examination to certain facts tending to show that the deceased on the day of the homicide sought to bring about a rencounter between the defendant and himself, may be cross-examined as to former statements made by him relative to the matter, inconsistent with his direct testimony, and as to any matter connected with it tending to show the mental condition of the deceased towards the defendant.

ID. — MEANING OF WORDS—INFERENCES AS TO STATE OF FEELING—STRIKING OUT EVIDENCE—INSTRUCTION. — A witness for the prosecution cannot testify as to his understanding of the meaning of words used by the deceased, or to the inferences drawn by him from the surrounding circumstances as to the state of feeling between the deceased and the defendant; but the error in admitting such evidence is cured if the court subsequently orders it stricken out, and instructs the jury not to consider it.

ID. — RE-DIRECT EXAMINATION—STATEMENT OF DEFENDANT. — On his redirect examination, a witness for the prosecution may testify as to a statement made by the defendant shortly after the homicide, and related to and connected with the circumstances thereof, as detailed on his examination in chief and cross-examination.

ID. — RIGHT OF JURY TO FIX PUNISHMENT—INSTRUCTIONS—VERDICT. — On the trial, the jury, after agreeing upon a verdict of murder in the first degree, differed as to the penalty. They were then instructed as to their right to fix the penalty at death or imprisonment for life, or to return a verdict without affixing the penalty. The court did not directly inform them that if they returned a verdict without declaring the punishment,

it would be required to pronounce a judgment inflicting the penalty of death, but it gave them to understand that such would be the legal effect of the verdict. The jury thereupon returned a verdict of murder in the first degree without declaring the punishment. *Held*, that the jury were not misled as to the effect of the verdict.

APPEAL from a judgment of the Superior Court of San Joaquin County, and from an order refusing a new trial.

The facts are stated in the opinion of the court.

*Eagon & Armstrong, J. H. Budd,* and *J. C. Campbell,* for Appellant.

*Attorney-General Marshall,* and *William M. Gibson,* for Respondent.

McKEE, J.—Uzza F. French, defendant and appellant in this case, was convicted by the verdict and judgment of the Superior Court of San Joaquin County of murder in the first degree, for the unlawful killing of Peter Wells, and sentenced to suffer the death penalty; and he appeals from the judgment and the order denying a motion made by him for a new trial.

The homicide was committed on the 14th of March, 1884, in the town of Oleta, in Amador County.

The contention made on the appeal is, that the conviction is illegal, because of irregularities and errors in law committed at the trial, against the exceptions of defendant. The errors assigned are predicated upon the admission of testimony against the defendant's objections and exceptions, and upon instructions given to the jury to his prejudice.

1. Marcellus Lee, a witness for defendant, on his examination in chief, gave testimony tending to show that between eight and nine o'clock of the morning of the day of the homicide, Wells, having made preparation to leave his house for the town of Oleta, asked the witness, who was then in his employment, to go with him; but the witness refused to go, and urged Wells not to go, because

he believed, "from what had occurred a day or two before, that French would be at Oleta"; and he said to Wells, "it would be going into the enemy's camp." To which Wells replied, "he could not help that, he was going, . . . . and if there was to be trouble there was no use in trying to stave it off." About nine o'clock, A. M., Wells rode off to Oleta in company with his son.

On cross-examination the witness testified, without objection, that he and Wells were the only persons present at the conversation stated in his direct testimony, but that he had had on that morning two or three other conversations with Wells, at which other persons were present, and that, on the day before the conversation, he had heard Wells say he was going to Oleta to hunt for one of his horses, which was lost. After so testifying on his cross-examination, the state asked him this question:—

"Within three or four days after the shooting did you have any conversation with Mrs. Wells, in which you said you had told Peter Wells that if he would let you have a rifle, you would put French in a prospect hole, and that Wells replied, he 'didn't want anything of that kind in his.'"

To that question defendant's counsel objected,—

"The answer must be immaterial, and to lay the foundation for a contradiction of an immaterial statement. It is immaterial." The objections were overruled, and the defendant excepted.

Answering the question, the witness testified, "that in a conversation which occurred a day or two before . . . . the trouble, I told Wells, 'If I thought that man [French] was hunting us in the chaparral, I would take a rifle and go down and get him,' . . . . and Wells said to me, 'No,' . . . . and I think I told Mrs. Wells what in substance I said to Wells."

It is contended that neither question nor answer was in response to the matter testified by the witness in his examination in chief.

But the matter of the direct testimony of the witness was the fact that Wells, being armed, left his own house, on the morning of the day of the homicide, to go to Oleta, where he knew French was, and the statement made by him, before starting, as to the trouble between French and himself, from which the jury could have drawn the inference that the object of Wells in going to Oleta, under the circumstances, was to bring about a rencounter between French and himself. Whether Wells went to Oleta with a hostile or peaceable intent towards French —with a determination to force a fight or quarrel upon him or not—was therefore a matter presented to the consideration of the jury by the direct testimony of the witness; and in the consideration of that question the jury were entitled on the cross-examination of the witness to any former statements made by him relative to the matter, inconsistent with his direct testimony; and to any matter connected with it tending to show the mental condition of the deceased towards the defendant.

The code rule is, that a witness in a civil or criminal action may be asked on cross-examination whether he has made any statement inconsistent with his direct testimony relative to any fact stated therein, and may also be examined as to any matter relevant to or connected therewith. (Code Civ. Proc., secs. 2048, 2049, 2052.) Besides, in the cross-examination of a witness, much must be left to the discretion of the judge who presides at the trial. Unless the record on appeal shows an abuse of discretion, appellate tribunals do not interfere. We think there was no abuse of discretion in overruling the objections made to the question. The matter stated in the question and answer was not irrelevant or immaterial.

2. The next assignment of error is, that the court, at the close of the evidence given for defendant, permitted the prosecution to ask of Joseph Young, a witness called by the prosecution in rebuttal of certain evidence given by defendant, the following question:—

"During your association with the deceased, Wells, and the *actions* on his part, from *words* of his and a combination of all the circumstances that would tend to throw light on the subject, what was the feeling and the expressed feeling between the deceased, Wells, and the defendant?"

The question was asked of the witness on his redirect examination. It was objected that the question was incompetent, irrelevant, and immaterial. But the court, against the objections and exceptions taken, permitted the witness to answer.

We think the ruling was erroneous.

A witness cannot testify to his understanding of the meaning of words used by another, or to inferences drawn by him from a combination of circumstances tending to throw light on the question of feeling between two persons. That is a matter for the jury, upon proof of the words or circumstances themselves. But although the question was answered, the answers of the witness were afterward stricken out. In answering the questions the following took place:—

Witness: "He [Wells] told me 'if Uz. [French] would come there, he would be treated just as well as ever.' I never heard him make any threats at all."

The court: "The last part of his answer is stricken out."

Witness continued: "He said if Uz. would come to his house he would be treated just as well as he ever was; this was said two or three days before the shooting."

Question: "I understand the remark made was two or three days before the killing?"

Answer: "Either two or three."

Defendant's counsel: "I move that that be stricken out."

The court: "You have your exception."

Defendant's counsel: "We move to strike out the an-

swer of the witness, 'If he had come to his house he would have been treated just as well as ever,' on the grounds that it is incompetent, irrelevant, and immaterial."

District attorney: "Let it be stricken out. We do not care anything about it."

This was the only testimony in the case stricken out by consent; and the court, in its charge to the jury, instructed upon the subject as follows: "The court instructs the jury that they should carefully exclude from consideration all matters of evidence offered and excluded, and also that which was admitted and afterwards stricken out, either by express order of the court or by consent of counsel by whom it was adduced."

As therefore the answers of the witness were stricken out, and the question remained unanswered, the ruling of the court as to the question did not affect any substantial right of the defendant.

3. The next assignment of error is, that the court overruled objections made by defendant to a question asked by the prosecution on the redirect examination of a son of the deceased, who had been examined in chief by the district attorney and cross-examined by defendant's counsel. The question was this: "State whether, as defendant passed by you, going down the street, did you hear him say anything about Joe Young?"

Defendant's counsel: "We object to it. That is something not testified before."

The court overruled the objection, and the witness, answering, testified: "He [French] said, 'If I had the other load into Joe Young I would be satisfied.'"

We think there was no error committed in overruling the objection. The witness testified on his examination in chief, to the effect that on the morning of the 14th of March he left home with his father to hunt for a horse which was tracked to a stable in Oleta; that they remained at the stable four or five minutes, and then

walked from there into Main Street, where, after walking about one hundred and fifty yards, they saw defendant with a double-barreled shot-gun, sitting in front of a saloon on the opposite side of the street. And according to the testimony of the witness, the following occurred in in the street:—

"French, when he saw us, called out, 'Stop, you s—— of a b——; I've got you where I want you!' 'Hold on,' said father, 'you are accusing me wrongfully.' About that time French raised the gun and cocked it. My father stopped, and did not move after that at all. My father said, 'Hold, now, you are too fast'; and French said, 'You are a damned liar'; and father said, 'You are accusing me wrongfully. I don't want any of this'; French said, 'I do. I have been hunting for it'; and father said, 'Uz., set down your gun and come to me like a man, and we will settle it'; and French said, 'You are a liar and a s—— of a b——'; and then he said, 'take the children out of the way; get out of that window, woman!' and then he shot. Saw my father's hands; there was nothing in them; they were by his side. My father did not make any attempt or demonstration towards drawing a weapon. After the shot my father fell backwards on the porch. He was shot in the forehead with a buck-shot."

On his cross-examination the witness also testified:—

"About four days before that, French said he had heard considerable threats that my father and Joe Young had made against him. Father knew what French had said. My grandfather had told him."

After which the witness, being recalled by the prosecution, on his redirect examination testified, without objection, that French, just after he shot, stepped into the saloon, and immediately stepped out again, with his gun in his hand, and started to go down the street, passing within four or five feet of the witness. Upon this, the question to which the defendant objected was asked

and answered; and as both question and answer related to and were connected with the circumstances of the homicide, as detailed on the examination in chief and cross-examination of the witness, the objection taken to the question was properly overruled.

4. The last assignment of error is, that the jury were misled by the instructions of the court upon the question of punishment, to return a verdict of murder in the first degree, without a declaration of what the punishment should be.

In its elaborate charge to the jury, the court several times—twice of its own motion, and once at the request of the prosecution—instructed them as to their powers and duties upon the question of punishment. In those given of its own motion, the court instructed them substantially in the language of section 190 of the Penal Code, which declares: "Every person guilty of murder in the first degree shall suffer death or confinement in the state prison for life at the discretion of the jury trying the same." And the instruction upon the same subject given at the request of the prosecution was as follows:—

"Should the jury believe from the evidence, and beyond a reasonable doubt, that the defendant is guilty of murder in the first degree, and should the jury so find, then the jury has the right, in such verdict, to fix the penalty of death, or of imprisonment in the state prison for life. The jury has the right, in case they find a verdict of guilty of murder in the first degree, to do so without fixing the penalty. In other words, gentlemen of the jury, if you find the defendant guilty of murder in the first degree, and believe that he should be punished by death, you may say in your verdict, ' We, the jury, find the defendant guilty of murder in the first degree'; or if you find him guilty, and believe that his punishment should be confinement in the state prison for life, you should say so in your verdict."

The instructions which were given were correct. (*People* v. *Jones,* 63 Cal. 168; *People* v. *Murback,* 64 Cal. 369.)

Upon receiving the charge of the court, the jury retired for deliberation, and afterwards returned into court, and by their foreman reported that they had not agreed upon a verdict, and that a juror desired to be further informed upon the question of punishment. The juror referred to then arose, and the following proceeding took place:—

"Juror.—I did not want to sentence the defendant to death.

"Court.—Do I understand the jury to disagree simply upon the matter of punishment?

"Juror.—Yes, sir; I am not willing to pass sentence . . . . by which the man should be killed, because I think there were some mitigating circumstances.

"Court.—The jury have the right to fix the penalty at death or imprisonment for life. . . . . If the jury bring in a verdict of guilty of murder in the first degree, without specifying the penalty, they may do so.

"Juror.—Then we are not compelled to do it?

"Court.—You are not compelled to do it."

Again the jury retired, and again they returned into court for information upon the same question. The court read to them section 190 of the Penal Code, and after it was read, the same juror arose and said: "I got the impression that if the verdict was returned of guilty of murder in the first degree, without anything further, it inflicted the death penalty. Some of my fellow-jurors thought it did not. I want to be certain of that."

Again the court read section 190 of the Penal Code, and in connection therewith informed the jury as follows:—

"I think it is the duty of the jury to fix the penalty, but at the same time, if you have agreed on a verdict of murder in the first degree, the court will receive it.

"If there is nothing specified as to the penalty, the

court will have its duty to perform, but what the duty will be the court will not say.

"I think it is a jury's duty to fix the penalty; they ought to do it."

Upon receiving this information, the jury once more retired, and afterwards returned into court with their verdict. It was declared by the foreman, and the court asked defendant's counsel if he desired to have the jury polled, to which counsel replied, "We do not." Thereupon the clerk was directed to record the verdict; and that being done, the clerk read it to the jury as recorded, and inquired of them "if that was their verdict"; but before all the jurors answered, defendant's counsel interposed with the following expression:—

"That that verdict has been rendered under a misapprehension of the court's instructions and the law, and if the jury knew, as is the fact, that that means hang, they would not have brought in that verdict."

After this the same juror arose and said: "If that is the effect of my verdict, that is not my verdict." Upon that expression of disagreement the court again asked defendant's counsel if he at that time desired to have the jury polled, to which counsel answered, "Yes, we do."

Under the direction of the court the clerk-proceeded to poll the jury, each of whom as his name was called answered that it was his verdict. When the name of the hesitating juror was called, the record shows that he expressed his agreement in the manner following:—

"The clerk.—Is this your verdict?

"Juror.—No, not if—and murmured in a low tone of voice something which could not be heard.

"The court.—What we desire to know is, whether this is your verdict.

"Juror.—Yes, that is my verdict, and I will leave the responsibility to the court."

The polling of the jury proceeded further, and all the jurors answered, "Yes, that is my verdict."

The jury was then discharged, and the defendant was remanded into the custody of the sheriff, and an order duly entered, fixing the time for sentence.

Hesitancy upon the part of the juror upon the question of punishment is very apparent. But that was not due to the instructions upon the question. The instructions iterated and reiterated, time and again, were unambiguous, and entirely consistent with the criminal law of the question as formulated by section 190 of the Penal Code. They were not contradictory. On the contrary, they were pointed and definite as to the powers exercisable by the jury upon the subject of punishment, in case they agreed upon a verdict of murder in the first degree. The instructions were therefore correct; and being correct and free from ambiguity of expression, it is not to be presumed that the jurors to whom they were given did not apprehend them, or that any juror may have been misled by them.

It is true that the judge himself seems to have hesitated about giving information to the jury as to what *his* duty would be in case of the return of a verdict of murder in the first degree, without an expression of agreement upon the question of punishment; but the juror who was instructed as to his duty could not have been misled by that in considering the question; he knew from the instructions that if no verdict was returned upon the question of punishment, the responsibility of inflicting the punishment upon the verdict to which he did agree would be upon the court, and there, as he expressed it, he "would leave it."

Of the duty of the court upon receiving such a verdict, there could have been no doubt in the mind of the judge. As declared by this court in *People* v. *Welch*, 49 Cal. 185: "If a jury shall agree that a defendant is guilty of murder in the first degree, but cannot agree that the punishment shall be imprisonment for life, or shall not declare that the punishment shall be such imprisonment, it will

be the duty of the court to pronounce judgment of death. The jury need not declare that death shall be inflicted in cases where they cannot agree on imprisonment,— since, if the verdict is silent in respect to the penalty, the court must sentence the defendant to death."

In other words, a person convicted of murder in the first degree shall not escape punishment because the jury that convicted him by a valid verdict may have disagreed upon the question of punishment, or, which is equivalent to the same thing, returned a verdict which was silent as to the penalty.

We find no prejudicial errors in the record, and the judgment and order must be affirmed. It is so ordered.

THORNTON, J., MORRISON, C. J., and MYRICK, J., concurred.