[Crim. No. 5800. In Bank. Jan. 25, 1957.]

THE PEOPLE, Respondent, v. WILBERT FELIX FRIEND, Appellant.

John R .Sorbo, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant appeals (by virtue of paragraph (b) of section 1239 of the Penal Code) from a judgment which imposes the death penalty after a jury verdict which found defendant guilty of murder of the first degree and was silent as to penalty, and from an order denying defendant's motion for new trial. We have concluded that the issue of guilt was fairly tried and that the judgment and order denying a new trial should be affirmed insofar as relates to the conviction of murder of the first degree, but (in accord with *People* v. *Green* (1956), *ante,* p. 209 [302 P.2d 307]) must be reversed and the cause remanded for a new trial on the issue of penalty only, because there were prejudicial errors which resulted in a miscarriage of justice (Cal. Const., art. VI, § 4½) affecting solely the issue of punishment.

At the trial no evidence was offered by defendant. From the prosecution evidence, including voluntary statements of defendant to officials which demonstrate abjectly honest at-

tempts of defendant to recall and recount the circumstances of the killing, the following appears:

On the evening of August 31, 1936, defendant, after consuming an unknown quantity of gin and losing money playing pool, walked along the beach in La Jolla. Defendant needed funds and decided to rob any victim he might find. He removed a leg from a picnic table or bench with the purpose of using it as a club. Defendant walked until he saw Ruth Muir sitting alone on a bench. He approached her from behind, struck her on the head with the club, dragged her to a nearby ditch, and attempted to rape her. He was unable effectively to carry out his purpose to rob because Miss Muir had no valuable possessions. Her death was caused by fractures of the skull and many other injuries.

The body was discovered on September 1, 1936. On that day defendant was working as a caddy at a golf course; he there learned that his victim had died. Asked what he did then, he replied: "Oh, I stuck around there for two—three hours, and then I took off, caught a streetcar to San Diego, and I thought I'd try to get away from myself and I couldn't do it . . ." The preceding night's events, even at that time, he thought, seemed "like more or less a dream, . . . but I still had it in my mind what I did."

On September 12, 1936, police officers left a note on a tent which defendant used as a dwelling. The note asked defendant to call at the police station. Defendant returned to his tent shortly thereafter. He found the note and called at the police station as requested. He was questioned concerning the killing of Miss Muir, denied knowledge of it, and was not held. The crime remained an unsolved mystery for nearly 19 years, until defendant, who had changed his manner of living, himself provided the solution.

In May, 1955, defendant, who had been living in Detroit, returned to California, telephoned a reporter, and stated that he wished to confess to the killing of Miss Muir. Defendant was subsequently arrested and made the above mentioned voluntary statements which are in evidence. Police at first doubted his confession but he persisted and satisfied them as to his veracity. He explained that he had previously refrained from confessing because he had not wanted to hurt people dear to him, and that he had determined to confess inasmuch as his father had died in 1945, his mother in 1953, and his wife in

1954, and there was no one left who would be particularly shamed or hurt by his confession.[1]

Defendant complains of the italicized portion of the following instruction: "You may not consider the matter of punishment in determining whether or not the defendant is guilty, or if you find him guilty, in determining the crime or degree of crime of which he is guilty. However, if you find the defendant guilty of murder of the first degree, you may then consider the consequences of the two possible sentences in determining what punishment the defendant should receive. *A prisoner sentenced to either death or life imprisonment may be pardoned or may have his sentence reduced by the Governor. A prisoner serving a life sentence may be paroled, but not until he has served at least seven years.*" (Italics added.)

On behalf of defendant it is suggested that this court should reexamine the decision in *People* v. *Byrd* (1954), 42 Cal.2d 200, 207-208 [266 P.2d 505], where the giving of the above quoted instruction was approved. (See also *People* v. *Reese* (1956), *ante*, pp. 112, 116-117 [301 P.2d 582].) It is argued that the instruction is prosecution-slanted, because analysis of the periods of time served for first degree murder (Beattie (1951), *California Prisoners, 1945-1949,* p. 34, published by the Research Committee of the Board of Corrections) shows that the median time served by persons sentenced to life imprisonment for first degree murder is much more than seven years, particularly when the prisoner has a prior conviction of felony. (Defendant's previous criminal record, disclosed by the judgment and probation officer's report in this case, will be available for consideration of the Adult Authority should defendant be sentenced to life imprisonment. See Pen. Code, § 1203c.)

The italicized portion of the quoted instruction correctly states code rules of law (Pen. Code, § 4800: "The

---

[1]Illustrative of the background of defendant during the intervening years is the following excerpt from the report of the probation officer (a report which does not appear to have been before the jury but which was before the court at the time of sentence and is included in the record here): "The subject was a heavy drinker and it was during his drunken periods that he would get into trouble. During the period from 1937 until 1941 the subject was involved in burglaries and sex crimes, the sex crimes including lewd and lascivious acts, contributing to the delinquency of minors, indecent explosure and rape. *He submitted to a double orchidectomy in 1941 and since that date he was arrested but once and that for drunk and disorderly conduct,* date September 21, 1952, for which he paid a $35 fine. His interest in sex diminished after the operation and never gave him more difficulty." (Italics added.)

general authority to grant reprieves, pardons and commutations of sentence is conferred upon the Governor by Article VII of the Constitution of the State of California''; Pen. Code, § 3046: ''No prisoner imprisoned under a life sentence may be paroled until he has served at least seven calendar years'').[2] The quoted rules are pertinent as matters of fact to be considered in determining the penalty rather than as propositions of law. It is to be presumed that defendant, if he had sought to do so, would have been accorded opportunity to show other related pertinent facts as to minimum, median, and maximum terms of imprisonment actually served for first degree murder. (*People* v. *Green* (1956), *supra, ante,* p. 217.) In the circumstances it does not appear that defendant can complain as to the giving of the factually accurate statement of the rules of law.

█ In this case, however, as in *People* v. *Green* (1956), *supra,* there is error which requires reversal and a new trial solely on the issue of punishment. Here, the error involves the same untenable concept that under the law it is the duty of the jury to impose (or to permit the judge to impose) the death penalty unless there be evidence of mitigating circumstances, thus implying a limitation on the jury's statutory function, but the error arose in a different manner than in the Green case. The court in its formal written instructions to the jury did not suggest, as it stated in Green (*supra, ante,* pp. 209, 217-218), that ''The discretion which the law invests in you . . . is to be employed only when you are satisfied that the lighter punishment should be imposed. If you find the defendant guilty of first degree murder and do not find extenuating facts or circumstances to lighten the punishment it is your duty to find a verdict of murder in the first degree and fix the penalty at death.'' Rather, the formal written instructions concerning the subject of punishment for first degree murder given here, after the instruction quoted *ante,* page 754, proceed as follows:

''The law of this State provides that every person guilty of murder in the first degree shall suffer death or confinement in the State prison for life, at the discretion of the jury that finds him guilty. If you should find the defendant guilty of murder in the first degree, it will be your duty to determine which of the two penalties shall be inflicted, the death penalty

---

[2] As the prosecuting attorney stated in argument concerning the last sentence of the instruction (concerning parole), ''That doesn't mean that he will be; it just means that he may.''

or confinement in the State prison for life. If you should fix the penalty as confinement in the State prison for life, you will so indicate in your verdict, using a form that will be handed to you when you retire to deliberate, but if you should fix the penalty as death, you will not specify the death penalty in the verdict, and you will say nothing about punishment in the verdict. In determining which punishment shall be inflicted, you are entirely free to act according to your own judgment.''

The above quoted formal instructions, commendably, are free from any suggestion that the punishment fixed and favored by law is death (except insofar as an implication might in a combination of circumstances arise from the statement that ''if you should fix the penalty as death, you will not specify the death penalty in the verdict, and you will say nothing about punishment in the verdict''[3]) and that only on a finding of mitigating circumstances is the jury free to exercise any discretion as to penalty, but unfortunately the written formal instructions were not the only ones given to the jury. The erroneous concept that death is the penalty preferred by the law in the absence of mitigating circumstances was conveyed to the jury by a combination of circumstances and events which are hereinafter related. It is emphasized at the outset that we are not holding that any of such circumstances or events, standing alone, would necessarily constitute error. But as they were combined here they acquired a gravely erroneous import and were clearly prejudicial on the issue of penalty.

■ The subject of ''mitigation'' was injected into the case by the prosecuting attorney in argument. (As is developed hereinafter, that subject properly could have been argued if evidence pertinent to mitigation had not been in effect excluded from the jury's consideration by unduly restrictive definitions and if the jury had been adequately informed as to the scope of their function, including unequivocal instruction that it was wholly unnecessary to find evidence of mitigation as a basis for fixing the penalty at life imprisonment.) After summarizing the facts the prosecutor said, ''those facts certainly show no *mitigation*. I think it is an offense that is extremely aggravated. . . . There is certainly no provocation and there is no *mitigation* that I can see from the evi-

---

[3]This statement, as hereinafter pointed out, acquires significance when considered in the light of the prosecution argument and the oral instruction quoted *post*.

dence. When you arrive at the position, after reviewing the evidence, that you feel this is a first degree case, then the question of penalty comes into play. . . .

"What penalty is justified on this evidence? You will be given, I am sure, two forms of verdict, one which if you feel life imprisonment is the proper penalty the verdict will so state. There is another penalty and that is the death penalty. *That is the penalty in which the defendant is found guilty of first degree murder and the jury makes no recommendation,*[4] *and when they make no recommendation there is only one sentence the Judge passes,* and that is execution, the death sentence. What penalty does this evidence show? The Judge will tell you it is a matter within your discretion. It is something you may consider, look over, and decide. You can come to your own conclusion. Now I asked you at the beginning of this case if you had any prejudice or beliefs against the death penalty. All of you stated that you did not, that you felt that you could vote for such a penalty in a proper case. And that is all I am asking you to do, is to say 'Is this a proper case?' The People contend that *this is a proper case. There is no mitigation,* there is not one factor in the case to show *mitigation.* What factor is there of any *mitigation* in this brutal assault upon Ruth Muir? *Not one single factor.*

"The People feel that this is an aggravated offense and it is an offense in which the death penalty is justified. The jury is justified in exercising their discretion in returning a penalty—*returning a verdict without fixing*[5] *the penalty,* a first

---

[4]Strictly speaking, it is inaccurate to say that the jury makes a "recommendation." Under the statute the jury is not given the privilege of *recommending* a penalty; rather the statute unqualifiedly imposes on the jury the function and duty of *fixing* the punishment at either death or life imprisonment. (Pen. Code, § 190.)

[5]This statement by the prosecutor (that "The jury is justified in exercising their discretion in returning a penalty—returning a verdict *without fixing* the penalty, a first degree verdict, which would mean the death penalty") is ambiguous and confusing. If the jurors understood therefrom—as conceivably they might—that they could return "a verdict without *fixing* the penalty," it presents the same vice which in *People* v. *Hall* (1926), 199 Cal. 451 [249 P. 859], was held to require reversal.

The erroneous implications of this statement that the jury could return a verdict without themselves *fixing* the penalty might be heightened rather than lessened by the statement (quoted *ante,* above) that "when they [the jury] make no recommendation there is only one sentence *the Judge* passes, and that is . . . the death sentence." (Italics added.) Since the implied partial overruling of *People* v. *Welch* (1874), 49 Cal. 174 (and the cases following its basically erroneous concept), in *People* v. *Hall* (1926), *supra,* 199 Cal. 451, 456-458, it has been the law

degree verdict, which would mean the death penalty. . . .

"[W]e sincerely feel that from this evidence that the defendant is guilty of first degree murder and that there is no *mitigation* and that the death penalty should be exercised by this jury in this case, that there is no *mitigating factor.*" (Italics added.)

Defense counsel argued, concerning "mitigation," as follows:

"Mr. Low [the prosecuting attorney] said there were no mitigating circumstances. I think there are. I think the biggest one is the fact that the defendant turned himself in. Without him there would have been no solution to this crime. It would have gone down as another unsolved crime. I don't offer that to you as a suggestion for reducing the degree . . . but I think it is a mitigating circumstance."

In closing argument the prosecuting attorney said, "I . . . do not take the death penalty lightly. I think it is a serious matter and should be carefully considered and I think the evidence is such in this case that there is no *mitigation* and no justification for what Mr. Friend did. . . .

*"The only question in this case is the penalty.* . . . Counsel said a *mitigating factor* was the fact he has confessed. . . . He has had nineteen years of freedom and of life, nineteen years more than Miss Muir [defendant's victim], and now because his wife is dead he has confessed. What is in *mitigation* in view of this offense because of that? *Not one thing in this case shows mitigation.* It is a brutal, unprovoked assault upon a defenseless woman . . . We feel from this evidence you should use your discretion, use it wisely, study the case, and feel when you come to the conclusion after you have thought it over that you will find this is a first degree case and that the imposition of the death penalty is justified." (Italics added.)

As stated by the prosecutor, "The only question in

that the judge could not impose the death sentence (after a jury trial) unless there was "legal evidence" that the jury had unanimously agreed upon and *fixed* the penalty at death. Here, it appears that the jury must have understood what the result of the silent verdict would be and the error in that connection, as developed in the text, consists in misleading them, or in failing to correct their misapprehension, as to the substantive law and as to a limitation on their function, the limitation on their function being the implication that it would be improper under the law and in the view of the judge to fix the penalty at life imprisonment unless there was evidence of mitigating circumstances. As will also appear in the text, there was error in unduly limiting, by definition, the nature of the evidence which could be considered in mitigation of punishment.

this case is the penalty." That is what he told the jury and in that connection at least eleven times he stressed the asserted absence of "mitigation" or a "mitigating factor," and *implied a necessity for finding evidence of mitigation if the jury were to return other than the silent verdict.*

Obviously the greater emphasis of the prosecuting attorney's arguments above quoted is addressed to persuading the jury that there is an *absence of mitigating factors* rather than that there is *presence of aggravating elements.* This in itself suggests the view that the law prefers that the punishment shall be death, rather than life imprisonment, in the absence of mitigating circumstances. Such view (held erroneous in *People* v. *Green* (1956), *supra, ante,* pp. 209, 218), is clearly portrayed in the prosecutor's statement in his opening argument that "The People contend that this is a proper case [for the death penalty]. There is no mitigation, there is not one factor in the case to show mitigation . . . [W]e sincerely feel that from this evidence that the defendant is guilty of first degree murder and that there is no mitigation and that the death penalty should be exercised by this jury in this case, that there is no mitigating factor." It is true that the prosecutor also said that "The People feel that this is an aggravated offense," but by far the greater emphasis was placed on asserted absence of mitigating factors. ■ We held in the Green case that (*ante,* p. 218) "[6] It is *not* a function of the jury either to *lighten* [mitigate] the punishment or *increase* [aggravate] the punishment; they have no such power. ■ The statute clearly and equally states two alternatives as punishment; it gives preference to neither. [7] It is the function and responsibility of the jury to select, and to designate in their verdict, which of the two punishments prescribed by the statute shall be imposed in any given case."

■ If a prosecutor is trying to persuade the jury to select the death penalty, it would seem more to the point and more consistent with the statute that he should place the greater emphasis of his argument on developing *aggravating* circumstances rather than the mere absence of *mitigating* factors. The statute no more suggests that the punishment should be death in the absence of mitigating circumstances than it suggests that the penalty be life imprisonment in the absence of aggravating circumstances. Neither penalty attaches automatically, or preferentially by law, in any case. The selection in every case is left entirely to the jury.

We recognize, of course, as we recognized in the Green case (*ante,* p. 231), "that trial judges and prosecuting officers have justifiably understood that legally they could continue to follow practices based on that line [the cases stemming from *People* v. *Welch* (1874), *supra,* 49 Cal. 174] although, commendably, many of them have voluntarily acceded to the admonitions hereinabove quoted [see *ante,* pp. 227-229]." But it should also be recognized by all concerned that the meaning of the statute had been clear and undisputed for more than 30 (if not for more than 60) years prior to the Green case, and that by the Green case we merely required "compliance with that law." (See *ante,* pp. 226, 231-232; see also *People* v. *Bollinger* (1925), 196 Cal. 191, 207 [237 P. 25]; *People* v. *Leary* (1895), 105 Cal. 486, 496 [39 P. 24].) More specifically, in our decision in the Green case we refused to longer tolerate the continuance of two conflicting lines of opinion, one of which permitted as "not error" the giving, in the uncontrolled discretion of the trial judge, of instructions based on the Welch line of cases, while the other recognized (without even a criticism of the latter view) that the trial judge could, in his sole discretion, instruct in accord with the statute and the Leary-Bollinger line of cases. (See *ante,* pp. 218-226 and 231-232.) The law of the Green case therefore is novel only in that it requires compliance by all judges and in all cases (of first degree murder) with the meaning of the statute which has been so long recognized as "clear beyond question." (*People* v. *Bollinger, supra,* at p. 207.)

That the prosecuting attorney's arguments became a pivotal factor in the jurors' debates is made unmistakably clear by what follows.

The jury did not readily come to an agreement as to punishment. They began their deliberations at 2:38 p.m. on August 2, 1955. At 11:35 p.m. on that day they returned to court, and there occurred the following colloquy between judge and jury:

"THE FOREMAN: . . . We have a question *of a point of law and we feel it would be helpful to us in determining a verdict* . . . What we wish to know is *is there an interpretation of the law* which may aid the jury in determining whether the punishment should be a life sentence or the maximum penalty in a verdict of first degree murder, that is, *does the law consider any legal mitigation in this respect?* If it does, may we be made available of such?

"THE COURT: The only thing I can tell you is that it is entirely up to you folks. *I will ask you a question: Do you find any mitigating circumstances?*

"THE FOREMAN: *I am of the opinion that there are circumstances which . . . may be considered to be in mitigation. I am not sure how the law defines mitigating and I don't know what Webster says on it either, frankly.*

"THE COURT: Get me the dictionary and I will read it to them. . . . Webster's New International Dictionary, Second Edition, . . . defines mitigate as follows: To render or become mild or milder; to mollify. 2. To moderate; to make or become less severe, violent, fierce, cruel, intense, harsh, rigorous, painful, and in those cases the word 'less' I presume is supposed to be before every word. It says 'or become less severe, violent, fierce, cruel, intense, harsh, rigorous, painful,' and so forth, so it would mean less severe, less violent, less fierce, less cruel, less intense, less harsh, less rigorous, less painful. Next is to soften, appease; meliorate; diminish, lessen; temper; as, to mitigate heat or cold, grief, a punishment or an offense. Now mitigation means an act of mitigating, or state of being mitigated, abatement or diminution of anything painful, harsh, severe, afflictive, or calamitous; alleviation; moderation; palliation, as, the mitigation of pain, grief, rigor, punishment.

"The only thing I can say to you, ladies and gentlemen, is that you heard the evidence; you are the sole judges as to what the penalty or punishment is to be in this case. That is up to you. I can't tell you what to do. I gave you all the instructions. *You have the instructions with you and if you can find any mitigating circumstances in the case, why, if that is what you are looking for, why it is up to you to find them.* I can't tell you anything about them. If you want to argue some more about it I will let you go back; if you don't want to I will put you to bed. What do you want? *In my opinion there is absolutely no reason why you shouldn't arrive at a verdict.*

"THE FOREMAN: "We will return and try to come up with a verdict." (Italics added.)

At 11:31 a.m. on August 3, 1955, the jury returned their verdict which found defendant guilty of first degree murder and was silent as to punishment.

 It is manifest to us, from the circumstances which have been hereinabove related, that the jurors had gained

the erroneous[6] concept that, in the conscientious discharge of their *legal duty*, in order to justifiably return the form of verdict specifying the punishment of life imprisonment, as opposed to the form "in which the defendant is found guilty of first degree murder and the jury makes no recommendation," they must first find mitigating circumstances, and that the trial judge, when the jury sought enlightenment on the subject, although he told them "that it is entirely up to you folks," not only failed to effectively disabuse them as to their erroneous belief but, rather, affirmatively joined in compounding it by giving the oral instructions as to what might constitute mitigation, instructions which the jurors apparently interpreted to rule out for purposes of mitigation of punishment any consideration of the evidence which the foreman had thought "to be in mitigation." It will be remembered that defendant's counsel, answering the prosecutor's argument, told the jury, "I think there are [mitigating circumstances]. I think the biggest one is the fact that the defendant [after nineteen years while the crime remained unsolved] turned himself in. Without him there would have been no solution to this crime." The prosecutor replied, "What is in mitigation in view of this offense because of that? Not one thing in this case shows mitigation." Thereafter, when the foreman of the jury asked the court for "an interpretation of the law which may aid the jury in determining whether the punishment should be a life sentence or the maximum penalty in a verdict of first degree murder, that is, does the law consider any legal mitigation in this respect," the judge, in replying to the foreman's request, said, ". . . I will ask you a question: Do you find any mitigating circumstances?" And when the foreman answered, "I am of the opinion that there are circumstances which . . . may be considered to be in mitigation. I am not sure how the law defines mitigating . . . ," the judge read the dictionary definitions hereinabove quoted and ended the colloquy by declaring, "In my opinion there is absolutely no reason why you shouldn't arrive at a verdict."

It is apparent to us that the jurors hearing the arguments of counsel and the statements of the judge must have understood that according to law (in the view of the judge) the prosecutor was correct in arguing that there was not a single factor in the evidence to mitigate punishment; that defense counsel was mistaken in his contention that the return and

---

[6]*People* v. *Green* (1956), *supra, ante,* pp. 217-220, 231-232.

confession of defendant could be considered as mitigating factors in fixing the punishment; and that the foreman of the jury likewise was mistaken in his announced belief that there were circumstances (presumably the undisputed facts referred to by defendant's counsel) which could "be considered to be in mitigation." As hereinafter shown, under appropriate instructions the *weight* of the evidence as tending to indicate that the death penalty on the one hand or life imprisonment on the other might be more appropriate could properly have been argued. ▮ But it was not correct to assert that in relation to fixing the penalty, "Not one thing in this case shows mitigation." It is difficult to conceive of evidence any more pertinent to the end of mitigating punishment[7] in a first degree murder case with the background of this one than that revealing the change in defendant's manner of living which culminated in his return to California and confession of the theretofore unsolved crime.

We have in mind that in *People* v. *Barclay* (1953), 40 Cal. 2d 146, 157-158 [252 P.2d 321], a first degree murder case, it is said: "Since the issues of punishment and guilt are determined at the same time, there is danger that evidence or instructions offered on the former issue may influence the verdict on the latter issue. Accordingly, to avoid prejudice to either the People or the accused by injection of collateral issues into the case, evidence of the good or bad habits and background of the accused is generally held inadmissible [citations], and the consideration of the jury is limited to the facts and circumstances attending the commission of the offense itself. [Citations.]" The Barclay case, however, recognizes that it has been said (*People* v. *Larrios* (1934),

---

[7] The character and scope of evidence pertinent to punishment which should be received in a case wherein the jury is required to fix the penalty, is a subject which could well receive legislative attention. This state has long since accepted the view (as recognized and implemented by the indeterminate sentence laws and other acts) that, generally speaking, punishment should be fitted to the perpetrator of the crime, not merely the crime. In tailoring punishment for most offenders the controlling agency has the benefit of a complete study of the person. In the whole life story the particular crime is an incident, a controlling one for the time being, probably, but only one of many which the board considers in reaching its ultimate conclusion. It seems, therefore, incongruous that in a case of first degree murder the jury conceivably may be given the responsibility of selecting life imprisonment or death as punishment, but in making that determination may be denied the full measure of enlightenment which for less drastic punishments is available to the administrative board. It appears that in this respect the law, when and if so applied, continues the outmoded view that punishment must inexorably fit the crime, not the offender.

220 Cal. 236, 241-242 [30 P.2d 404]), concerning evidence which "would have had no direct bearing on the homicide," that "a person on trial for his life should, as against technical objections, be permitted to state, within reasonable limitations, something of his background." We note also that the trend is toward the more liberal admission of evidence pertinent only to the selection of penalty. For example, it has become established practice to advise the jury *of the facts* concerning the possibilities of pardon, commutation, parole, etc. (See *People* v. *Letourneau* (1949), 34 Cal.2d 478, 493 [12] [211 P.2d 865]; *People* v. *Osborn* (1951), 37 Cal.2d 380, 384-385 [231 P.2d 850]; *People* v. *Chessman* (1951), 38 Cal. 2d 166, 189-190 [238 P.2d 1001]; *People* v. *Barclay* (1953), *supra,* 40 Cal.2d 146, 157-158; *People* v. *Byrd* (1954), *supra,* 42 Cal.2d 200, 206-208 [2]; *People* v. *Reese* (1956), *supra,* pp. 112, 116; *People* v. *Green* (1956), *supra, ante,* pp. 209, 216-217].) ▇ Obviously *the law* pertaining to pardons, commutations and paroles has not the slightest relevancy to the issue of guilt; it is pertinent only as a *fact* which may be considered in selecting the penalty to be imposed; i.e., it is evidence which may be considered as relevant to the "aggravation" or "mitigation" of punishment in the sense in which those terms have been used in relation to the selection of penalty. Here we are not concerned with any problem as to error in the admission or rejection of evidence pertinent to punishment (other than has hereinabove been disposed of) but we are concerned with instructions—the dictionary definitions—which the jurors apparently interpreted as ruling out of consideration (for purposes of mitigation) evidence which had been admitted.

▇ In the state of the record we think that, if the dictionary definitions of "mitigate" were to be read, it was the duty of the court to have instructed the jury specifically that they could in the exercise of their discretion consider the evidence as to defendant's voluntary return and confession as material in their selection of punishment, and that in any event it was wholly unnecessary to find any evidence of mitigation as a basis for fixing the punishment at life imprisonment.

▇ Ever since *People* v. *Leary* (1895), *supra,* 105 Cal. 486, 496, it has been the recognized law of this state that by section 190 of the Penal Code, as amended, the Legislature has "confided the power to affix the punishment within these two alternatives [death or life imprisonment] to the absolute discretion of the jury" and in *People* v. *Bollinger* (1925),

*supra,* 196 Cal. 191, 207, it was expressly declared that "the law places no restriction upon the jury's exercise of such discretion, nor does it attempt to confine its exercise to cases presenting palliating or mitigating circumstances." (See also *People* v. *Green* (1956), *supra, ante,* p. 229, and cases there cited.) Certainly under the rule above stated the undisputed fact that defendant voluntarily returned to California and confessed the unsolved crime could properly have been considered by the jury to constitute a substantial and persuasive factor to the end of "mitigating" (more accurately, in the process of *selecting*) the punishment. ■ The jury foreman was correct, not mistaken, in his opinion "that there are circumstances which . . . may be considered to be in mitigation." Persuading him to the contrary view, as apparently was the effect of the judge's remarks and oral instructions during the colloquy, was gravely prejudicial error resulting in a miscarriage of justice.

Nothing that we have said in this opinion is to be construed as holding either (1) that appropriate dictionary definitions, accompanied by relevant instructions as to the law, may not be read to the jury or (2) that counsel may not properly argue the effect of evidence in relation to the punishment which should be imposed. ■ In this connection we point out that, accurately speaking, the issue as to penalty in a first degree murder case is not one of *mitigation* or of *aggravation* of punishment. Inasmuch as the statute provides *equally* the two alternative penalties of death and life imprisonment it necessarily follows that the function of the jury is not to "mitigate" or to "aggravate" punishment but is to make the selection as between the two penalties provided by law. ■ To aid the jury to act intelligently in making their selection, counsel may properly argue their respective views as to which punishment, under all the circumstances shown, will be more appropriate and desirable in the cause of justice. To that end, appeals to reason in the exercise of the jury's discretion may be proper; so also may be appeals for clemency or for stern retribution. But the jury must not be misled into thinking (or be permitted to persist in an evidenced or known belief) that their discretion in the selection of penalty, as between either of the two alternatives, is in any way circumscribed or limited by law. Their discretion within that area is absolute and they should be so informed.

It is an onerous task which jurors are called upon to perform

in the trial of a first degree murder case. They are citizens taken from the everyday walks of life. Suddenly they are confronted with the responsibility of finding guilt or innocence for a human being charged with one of the most serious crimes known to the law. The responsibility is a dual one: to the defendant on trial in defense of his life and liberty and to the state which brings him to trial in defense of its society. And when the jurors find guilt (of the class and degree we are discussing) they must face the grim business of selecting life imprisonment or death for a fellow human being. That is a responsibility which is theirs and concerning which there must be no equivocation in the instructions. They may be told that the state is responsible for the law which defines murder of the first degree and which prescribes that every person guilty of such offense "shall suffer death, or confinement in the state prison for life," but in that event they must further be told that by the very terms of the statute the responsibility of making the selection as between death or imprisonment for life is committed absolutely to the jury.

Quite naturally jurors, in the conscientious discharge of their duty, are eager, as were those in this case, to have all the guidance the law can give them. This poses a delicate task for the trial judge but his duty is clear. He must, of course, inform the jurors that they have no concern with punishment unless, under the instructions applicable to the trial of the issue of guilty or not guilty, they shall have found that beyond all reasonable doubt the defendant is guilty of murder of the first degree as charged. When and if they so find, the duty of selecting the penalty devolves upon them, and on them alone, and they should be instructed as to the absolute nature of their power in the exercise of that function.

From the discussion of the subject hereinabove and in *People* v. *Green* (1956), *supra, ante,* pp. 209, 217-221, 229-232, it appears that there need be no error in counsel's advancing arguments as to which penalty will better serve the objectives of punishment,[8] or in contending that the effect

---

[8]For some years many courts and writers on criminal law and penology have held that the purpose of legally adjudicated punishment is not or should not be vengeance, but rather deterrence of the offender and other prospective offenders from crime, assistance in their rehabilitation, and the protection of society. (See generally 24 C.J.S., Criminal Law, § 1974, p. 1180; 15 Am.Jur., Criminal Law, § 506, p. 155; 14 Cal.Jur.2d, Criminal Law, § 265, p. 516; Hall, General Principles of Criminal Law (1947), pp. 50-54, 130-137, 171-173, 419-421, 543, 568-569; Wharton, Criminal Law (1932 ed.), §§ 1-13.) Yet it cannot be denied that there still exists

of certain evidence is "mitigating" or "aggravating," as may affect their selection of the punishment to be imposed, provided that the jurors in every case are clearly and adequately instructed as to the full scope of their function. They should be told (in accord with the law as reviewed in *People* v. *Green* (1956), *supra,* and herein) that beyond prescribing the two alternative penalties the law itself provides no standard for their guidance in the selection of the punishment; that the law provides equally the two penalties of death or life imprisonment, but that neither penalty attaches automatically or at all until the jury unanimously agree upon their choice of punishment and designate it in their verdict; that the choice as between the two penalties is in every case committed to their absolute discretion; that there is no rule of law which suggests that the punishment should be death unless there is evidence of extenuating or mitigating circumstances nor does the law suggest that the penalty shall be life imprisonment unless there is evidence in aggravation of the offense; murder of the first degree is in its very nature an aggravated offense, one of the most serious known to the law; hence it carries with it the most serious punishments known to the law, death or imprisonment for life. The jurors should understand that it is their duty to conscientiously consider all the evidence in the case in arriving at their decision but that it is not essential to their choice of either penalty that they find palliating or mitigating circumstances on the one hand or evidence in aggravation of the offense on the other hand; that insofar as selecting the penalty is concerned (as between the two alternatives) the law does not itself prescribe, nor authorize the court to innovate, any rule circumscribing the exercise of their discretion, but, rather, commits the whole matter of its exercise to the judgment and the consciences of the jury; that in deciding the question whether the accused

authority that retribution can be considered as a factor relevant in the selection of punishment. (See *Williams* v. *New York* (1949), 337 U.S. 241, 248 [69 S.Ct. 1079, 93 L.Ed. 1337] ["Retribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence"]; *Pennsylvania* v. *Ashe* (1937), 302 U.S. 51, 55 [58 S.Ct. 59, 82 L.Ed. 43] [the state "may inflict a deserved penalty merely to vindicate the law or to deter or to reform the offender or for all of these purposes"]. For expression of the stark concept of retribution see the Mosaic law (Exodus XXI, 12, 24, 25): "He that smiteth a man, so that he die, shall be surely put to death. . . . Eye for eye, tooth for tooth, hand for hand, foot for foot, Burning for burning, wound for wound, stripe for stripe.")

should be put to death or sentenced to imprisonment for life it is within their discretion alone to determine, each for himself, how far he will accord weight to the considerations of the several objectives of punishment, of the deterrence of crime, of the protection of society, of the desirability of stern retribution, or of sympathy or clemency, of age, sex, human passion, ignorance or weakness, or (if appropriate under the evidence, of illness or intoxication or provocation not sufficient to reduce the degree or class of the crime), of the presumptions concerning, or possible uncertainties attaching to, life imprisonment, or of the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever which in the light of the evidence, the duty they owe to the accused and to the state, and the law as explained to them by the judge, appears to them to be important.

As has been hereinabove stated the error in this case arose from a combination of circumstances and events. The use of the so-called "silent verdict" form to imply the death penalty, together with the instruction concerning it, together also with the prosecuting attorney's arguments as to "mitigation" and regarding the "penalty in which the defendant is found guilty of first degree murder and the jury makes no recommendation," and the "verdict without fixing the penalty," are all circumstances which have necessarily been related in portraying the background upon which the error grew. It was from that background that the jury foreman asked for aid on "a question of a point of law" as to the selection of penalty, implied that the jury had gained the concept that the law expected "the maximum penalty in a verdict of first degree murder" unless there was "legal mitigation in this respect," declared positively that he was "of the opinion that there are circumstances which . . . may be considered to be in mitigation" but that he was "not sure how the law defines mitigating," and, as is made obvious by the verdict, was persuaded, after hearing the judge's oral instructions, that he had been mistaken in his opinion.

How much any one of the circumstances which have been related may have contributed to produce the erroneous initial concept of the jury as to their duty in the absence of mitigating evidence we need not determine. We note, however, that we do not hold that the use of the so-called "silent verdict" form with its accompanying instruction is

in itself error. Instructions as to the use of the "silent verdict" have been repeatedly upheld in varying circumstances. (See 13 Cal.Jur., Homicide, pp. 745, 746; 24 Cal. Jur.2d, Homicide, p. 864.) The instruction given on the subject in this case (quoted *ante*, pp. 755-756) is No. 306 in California Jury Instructions, Criminal. We are, however, in view of the fact that the grave error which brought forth that form of verdict has been fully disclosed in our decision in *People* v. *Green* (1956), *supra, ante*, pp. 209, 224, bound to recognize four facts which shadow the practice of reading this instruction and providing an accompanying form of silent verdict: (1) Such practice is a remnant of the admittedly mistaken holding of this court in *People* v. *Welch* (1874), *supra,* 49 Cal. 174, 185, that "The jury need not declare that death shall be inflicted—in cases where they cannot agree on imprisonment—since, if the verdict is silent in respect to penalty, the Court must sentence the defendant to death"; (2) the language used in the instruction and form of verdict may in some circumstances tend to confuse jurors and lead to error; (3) such language may lend itself to the accentuation of errors such as those which occurred here in relation to the subject of mitigation and the function of the jury; and (4) the practice has the appearance of (if it is not in fact) an attempt to load the scales of justice—as to punishment—against a person on trial for his life.

Dramatic illustration of the danger of the use of the type of instruction now in question is found in *People* v. *French* (1886), 69 Cal. 169, 176-180 [10 P. 378]. There the jury, after such an instruction had been given, retired to deliberate. They returned into court and the foreman reported that they had not agreed on a verdict and that a juror desired further information as to punishment. That juror said, "I am not willing to pass sentence . . . by which the man should be killed, because I think there were some mitigating circumstances." The court said, "The jury have the right to fix the penalty at death or imprisonment for life. . . . If the jury bring in a verdict of guilty of murder in the first degree, without specifying the penalty, they may do so. . . . You are not compelled to do it."

The jury again retired and again returned for information on the question of punishment. The same juror said, "I got the impression that if the verdict was returned of guilty of

murder in the first degree, without anything further, it inflicted the death penalty. Some of my fellow-jurors thought it did not. I want to be certain of that.''

The court said, ''I think it is the duty of the jury to fix the penalty, but at the same time, if you have agreed on a verdict of murder in the first degree, the court will receive it.

''If there is nothing specified as to the penalty, the court will have its duty to perform,[9] but what the duty will be the court will not say.

''I think it is a jury's duty to fix the penalty; they ought to do it.''

Again the jury retired. As in the case at bar, they returned a verdict silent as to punishment. Defendant's counsel objected that the verdict had been returned under a misapprehension ''and if the jury knew, as is the fact, that that means hang, they would not have brought in that verdict.'' The same juror said, ''If that is the effect of my verdict, that is not my verdict.'' When the jury was polled and the clerk asked, ''Is this your verdict?'' the dissenting juror first said, ''No, not if——'' and murmured something which could not be heard. Asked by the court if that was his verdict, he said, ''Yes, that is my verdict, and *I will leave the responsibility to the court.*'' (Italics added.)

Judgment of death on this verdict was affirmed. This court cited *People* v. *Welch* (1874), *supra,* 49 Cal. 174, and held (*People* v. *French* (1886), *supra,* pp. 179-180 of 69 Cal.), ''Of the duty of the court upon receiving such a verdict, there could have been no doubt in the mind of the judge. As declared by this court in *People* v. *Welch,* 49 Cal. [174,] 185: 'If a jury shall agree that a defendant is guilty of murder in the first degree, but cannot agree that the punishment shall be imprisonment for life, or shall not declare that the punishment shall be such imprisonment, it will be the duty of the court to pronounce judgment of death. The jury need not declare that death shall be inflicted in cases where they cannot agree on imprisonment,—since, if the verdict is silent in respect to the penalty, the Court must sentence the defendant to death.'

''In other words, a person convicted of murder in the first degree shall not escape punishment because the jury that convicted him by a valid verdict may have disagreed upon the question of punishment, or, which is equivalent to the same

---

[9] *Cf. ante,* pp. 756-757, 759-760.

thing, returned a verdict which was silent as to the penalty.''

In *People* v. *Hall* (1926), *supra,* 199 Cal. 451, 456, it was held, directly contrary to the Welch and related decisions, but not expressly overruling them, that ''[3] Under the law the verdict . . . must be the result of the unanimous agreement of the jurors and the verdict is incomplete unless, *as returned,* it embraces the two necessary constituent elements; first, a finding that the accused is guilty of murder in the first degree, and, secondly, legal evidence that the jury has fixed the penalty in the exercise of its discretion. [4] The jury may exercise its discretion as to the penalty in one of three ways. It may fix the death penalty by so wording its verdict, or by remaining silent as to the penalty, or it may by so wording its verdict fix the penalty at life imprisonment. *When the penalty is fixed* at death or at imprisonment for life *by definite and specific wording of the verdict no difficulty is or has been encountered . . .''* (Italics added.) Under a misapprehension as to the holding in *People* v. *Welch* (1874), *supra,* 49 Cal. 174, 185 (its true significance is not readily ascertainable except upon a reading of the last paragraph of the opinion rendered on denying rehearing) that case was relied on as authority for the proposition that the jury ''may fix the death penalty by . . . remaining silent as to the penalty'' and that a silent verdict ''affords conclusive evidence . . . that the jury has . . . exercised its discretion and thereby fixes the penalty at death.'' As we have already shown, the Welch case actually holds that the jury need not agree upon or fix the death penalty; that they must agree upon and fix the penalty only if it is to be life imprisonment, and upon failure to agree as to penalty (but agreement as to guilt of first degree murder) the judge must sentence the defendant to death.

It is stated in a note in 36 California Law Review 628, 632, that ''Once guilt has been agreed upon, the discretion of the jury is in practice exercised by choosing between two printed forms of verdict. One of these declares that the jury have found the defendant guilty of first degree murder and recommends[10] life imprisonment; the other simply announces a finding of guilty of murder in the first degree and is silent as to the penalty. This in itself seems prejudicial to the defendant in cases in which the jurors cannot agree on the recom-

---

[10]See footnote 4, *ante,* p. 757.

mendation of life imprisonment, after having agreed that the defendant did commit murder in the first degree. Judicial instructions to the contrary notwithstanding, jurors may, in choosing the 'simple' verdict, feel no direct responsibility for the imposition of the death penalty; or, having agreed on the degree of the crime, they may feel, after fruitless debate on the determination of punishment, that they cannot refuse to bring in a verdict specifying only their agreement that the defendant is guilty of first degree murder.''

▉▉▉▉ Although, as we have above indicated, the use of the silent verdict by trial courts relying on our earlier decisions may not in itself be held to constitute error, it would seem, now that the error in the decision creating the source of the practice[11] has been exposed (*People* v. *Green* (1956), *supra, ante,* pp. 209, 224, footnote 3), that the implication which is corollary to this court's statement (in *People* v. *Hall* (1926), *supra,* 199 Cal. 451, 456) that *"When the penalty is fixed* at death or at imprisonment for life *by definite and specific wording of the verdict no difficulty is or has been encountered"* (italics added), should be considered as further emphasized, and that henceforth the practice itself should be discontinued. (See also *People* v. *Crooker* (1956), *ante,* pp. 348, 357 [303 P.2d 753].) If continued, such practice, we apprehend, would often be urged as accentuating or contributing to the prejudice of any errors which conceivably could relate to punishment.

After consideration of the entire record we conclude that defendant has been fairly tried and convicted of the crime of murder of the first degree, insofar as guilt of the offense is concerned, but that he was not accorded the full measure of a fair trial on the issue of penalty. Hence, there has been a miscarriage of justice which necessitates a new trial on that issue. (Cal. Const., art. VI, § 4½; *People* v. *Green* (1956), *supra, ante,* pp. 232-235.)

For the reasons above stated the judgment and order denying a new trial are affirmed insofar as relates to the adjudication that defendant is guilty of murder and that the murder is of the first degree; on the question of penalty the judgment and order denying a new trial are reversed and the cause is remanded for retrial and redetermination of such question of penalty only, and for the pronouncement of a new sentence

---

[11]*People* v. *Welch* (1874), *supra,* 49 Cal. 174.

and judgment in accord with such determination and the law applicable thereto.

Gibson, C. J., Carter, J., Traynor, J., and McComb, J., concurred.

SPENCE, J.—Concurring and Dissenting.—I concur insofar as the judgment and order are affirmed, but I dissent insofar as the judgment and order are reversed.

The majority orders a partial reversal, purporting to rest its decision upon the authority of *People* v. *Green, ante,* p. 209 [302 P.2d 307]. I am of the view that the Green case is wholly inapplicable to the situation presented here and that the judgment should be affirmed.

It appears appropriate that I first make my position clear with respect to the decision in the Green case. I dissented in that case where the question involved was essentially one of statutory construction. I conceded in my dissent that if the question had then been an open one, "a plausible argument could be made for either construction." My dissent was based upon the ground that the question was not an open one; that recent decisions of this court had settled the rule; and that those recent decisions should be followed. The majority there, however, determined that those decisions should be overruled. The decision in the Green case has therefore declared a new rule which the trial courts are now required to follow. Under the circumstances, I do not believe that any useful purpose could be served by further dissent. I therefore yield to the views of the majority in the Green case regarding the construction to be placed upon section 190 of the Penal Code. It appears that the most important consideration now is to have a firmly established rule of construction for the guidance of the bench and bar in this important field of the law relating to the fixing of the penalty for first degree murder.

It does not follow, however, from my acceptance of the rule established in *People* v. *Green, supra,* that I should join in the partial reversal of the judgment here. The records in the two cases present entirely different situations, and I am of the view that the present majority opinion constitutes an unwarranted extension of the rule of the Green case.

The portion of the instruction which was challenged in the Green case read as follows: "The discretion which the law invests in you is not an arbitrary one and is to be em-

ployed only when you are satisfied that the lighter punishment should be imposed. If you find the defendant guilty of first degree murder and do not find extenuating facts or circumstances to lighten the punishment it is your duty to find a verdict of murder in the first degree and fix the penalty at death."

It thus appears that the jury was there instructed that it was their "duty" to "fix the penalty at death" if they did not find "extenuating facts or circumstances." The majority there held that the discretion conferred upon the jury by section 190 of the Penal Code was absolute. Under this construction of the section, the majority further held that the above instruction was erroneous as it had the effect of telling the jury that it *must* fix the penalty at death if it did not find extenuating facts or circumstances. No similar situation exists in the present case. Here both the prosecution and the defense properly proceeded upon the theory that the jury *could* consider the question of the existence or nonexistence of mitigating or extenuating facts or circumstances, if it so desired, in fixing the penalty. They therefore fully argued the question of whether such facts or circumstances existed, and the trial court read to the jury the dictionary definitions of "mitigate" and "mitigation" when the jury made its request.

The trial court here did not at any time tell or imply to the jury that it *must* fix the penalty at death unless it found such mitigating circumstances. The majority opinion concedes that the "formal instructions, commendably, are free" from any such suggestion. The fact is that, unlike the Green case, the jury here was told in the formal instructions that "in determining which punishment shall be inflicted, you are *entirely free* to act according to your own judgment." (Emphasis added.) Turning to the informal instruction given along with the dictionary definitions, the trial court was careful to point out that "The only thing I can tell you is that it is entirely up to you folks." And again, "The only thing I can say to you, ladies and gentlemen, is that you heard the evidence; you are the sole judges as to what the penalty or punishment is to be in this case. That is up to you. I can't tell you what to do. I gave you all the instructions. You have the instructions with you and if you can find any mitigating circumstances in the case, why, *if that is what you are looking for,* why it is up to you to find them. I can't tell you anything about them." (Emphasis added.)

The argument of the prosecuting attorney was likewise proper. When discussing punishment and the claimed absence of mitigating circumstances, he said: "The Judge will tell you it is a matter within your discretion. It is something you may consider, look over and decide. You can come to your own conclusion." And again he said: "We feel from this evidence you should use your discretion, use it wisely, study the case, and feel when you come to the conclusion after you have thought it over that you will find this is a first degree case and that the imposition of the death penalty is justified."

The sole implication which may be drawn from all the instructions, formal and informal, and from the argument of counsel is that the jury *could* consider the existence or nonexistence of mitigating circumstances, "if that [was] what [they were] looking for" in fixing the penalty. The last mentioned implication is entirely correct, and an express formal instruction to the effect that they could consider such matters, if they so desired, might well have been given even under the rule of the Green case, so long as it was made clear by the instructions, as it was here, that "In determining which punishment shall be inflicted, you are entirely free to act according to your own judgment"; that the question of punishment is "entirely up to you folks"; and that "you are the sole judges as to what the penalty or punishment is to be in this case. That is up to you." It therefore appears that the instructions given were equivalent to an instruction that the jury's discretion in fixing the punishment was "absolute."

In view of the record, as summarized here and in the majority opinion, I cannot agree with the majority that this case is controlled by *People* v. *Green, supra*; or that there was any error similar to that in the Green case which "involves the same untenable concept that under the law it is the duty of the jury" to impose the death penalty in the absence of evidence of mitigating circumstances. Permissive language was used at all times by court and counsel with respect to the fixing of the punishment, and no mandatory implications can properly be drawn therefrom. I therefore believe that the partial reversal by the majority rests upon an unwarranted and undesirable extension of the rule of the Green case to a situation in which it has no application.

In conclusion, I reiterate that I am of the opinion that it is entirely proper for counsel for the prosecution and counsel

for the defense to argue concerning the claimed existence or nonexistence of mitigating circumstances in a murder case. It is a matter of common knowledge that such arguments are ordinarily presented in practically every trial for murder. I am further of the opinion that the trial court may properly give, upon the jury's request, approved definitions of any words properly used by counsel in their arguments. I therefore conclude that counsel's arguments and the trial court's instructions here were wholly unobjectionable, and more particularly in the light of the trial court's explicit instructions, formal and informal, concerning the jury's absolute freedom to exercise its discretion in determining the punishment to be imposed.

I find no error in the record and would therefore affirm the judgment and order in their entirety.