[Crim. No. 7182. In Bank. Aug. 20, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. THOMAS E. PURVIS, Defendant and Appellant.

Martin N. Pulich, Public Defender, John D. Nunes, Chief Assistant Public Defender, James C. Hooley and Stephen W. Shaughnessy, Assistant Public Defenders, for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

PETERS, J.—Appellant was charged with having murdered (Pen. Code, § 187) Hazel Wilson on December 19, 1957. He was also charged with the prior conviction (September 1950) of the second degree murder of his then wife, Eleanor Purvis. He admitted the prior, and entered pleas of not guilty and not guilty by reason of insanity. A jury found him guilty of murder in the first degree, found that he was sane at the time of the commission of the crime, and fixed the penalty at death. On appeal this court affirmed the conviction of first degree murder, but reversed and remanded on the sole question of penalty (*People* v. *Purvis*, 52 Cal.2d 871 [346 P.2d 22]). On retrial, the second jury also returned a verdict of death. On review, that judgment was again reversed, and the case again remanded for retrial of the penalty issue (*People* v. *Purvis*, 56 Cal.2d 93 [13 Cal.Rptr. 801, 362 P.2d 713]). On the third trial of that issue the extreme penalty was again imposed. Motions for a new trial, and for a reduction of the penalty to life imprisonment, were made and denied. The appeal from this judgment is automatic. (Pen. Code, § 1239, subd. (b).)

Appellant's first marriage, in the State of Washington, in 1926 (when appellant was 18 years of age), terminated in 1929, when his wife secured a divorce on the ground of physical cruelty. He subsequently married his second wife (Eleanor), and they eventually came to Oakland to live. They had one child, Thomas Purvis, Jr., born in 1936, who had testified at previous trials, but who died before the trial here involved. This marriage was not a tranquil one. Appellant was a heavy drinker, and when drunk frequently beat his wife. He was arrested several times for disturbing the peace or for wife beating. On one occasion, on Eleanor's complaint, he was arrested and jailed for disturbing the peace. Upon release from jail after that arrest he killed Eleanor with a shotgun. His defense was that he killed in the heat of passion, during an argument over reports that she had been unfaithful. This resulted in the second degree murder conviction above mentioned. The prosecution (both at that time and in the present trial for the murder of Hazel Wilson) contended that there had been, and produced evidence of, premeditation.

After serving four years under that first conviction, appellant was paroled, and his sentence set at eight years. During parole he met Hazel Wilson, a married woman, who became his mistress. His relationship with her was also turbulent, and resulted in one incarceration for disturbing the peace (based upon a threat to do her bodily harm), to which he pleaded guilty. He also had a record for alcoholism, and of passing fictitious checks.

He acquired and kept a .22-calibre pistol, in contravention of the terms of his parole. Shortly after release from incarceration for threatening Mrs. Wilson, he killed her with that pistol. Again his defense was that he killed in the heat of passion during an argument. This defense was not accepted by the jury. He was convicted of first degree murder, and that conviction is now final.

The case presented by the prosecution at each of the three penalty trials was: (1) that the enormity of appellant's crime, his background and his character required the death penalty; (2) that the statistics of the Adult Authority prove that when a life sentence has been given under these circumstances, the convict has been paroled within ten years; and (3), if so paroled, appellant would kill again. This third trial, now under review, consumed about 10 weeks.

A brief reference should be made to our two previous opinions. In the first (*People* v. *Purvis, supra,* 52 Cal.2d 871),

the judgment of death was reversed for the reasons that: (1) the trial court erred in refusing to allow a qualified defense witness (Warden Duffy, a member of the Adult Authority) to state his opinion of the length of time appellant would serve before being considered for parole, or whether he would ever be paroled, if given a life sentence, and (2) the prosecuting attorney committed prejudicial misconduct in producing evidence which purported to show the parole statistics of similar convicts but in fact included no persons convicted of murder, and in arguing (without support of evidence) that the Adult Authority does not give proper consideration to the recommendations of prosecuting attorneys with respect to punishment. In that opinion it was stated (at p. 886) that to hold relevant evidence of the Adult Authority's effectiveness in protecting the public and its probable treatment of defendant ''would turn every penalty trial of a person convicted of first degree murder into a trial of the Adult Authority and its wisdom in paroling any number of other prisoners.''

The second appeal from the death penalty resulted in a reversal (*People* v. *Purvis, supra,* 56 Cal.2d 93) chiefly on the ground that prejudicial error occurred when the prosecution was allowed to produce hearsay evidence of the statements and actions of Eleanor Purvis (the victim of the first murder for which appellant had been previously convicted). That decision held that such evidence was immaterial if produced for the purpose of proving the state of mind of the former victim (whose death was not the basis of the case then on trial), and was not supported by sufficient foundation if offered for the purpose of proving adoptive admissions. It was also held that the prosecuting attorney was guilty of prejudicial misconduct, when, in his closing arguments, he assumed that the wife's hearsay statements had established the truth of the matter asserted.

On this appeal the following contentions are made:

1. Hearsay statements of Eleanor Purvis were again erroneously admitted contrary to the law of the case as established by the opinion on the last appeal.

2. Prejudicial misconduct occurred when the Sheriff of Alameda County (where the trial took place) made public declarations pertaining to the issues to be determined by the jury, which were published in the ''Oakland Tribune'' on the Sunday immediately prior to the day on which the prosecuting attorney made his closing argument to the jury, and he was allowed (over objection) to refer to the article in his argument,

all under circumstances where the jury had ample opportunity to read the publication and were not admonished to disregard it.

3. Certain other arguments by the prosecuting attorney constituted prejudicial error.

4. The trial court committed prejudicial error in failing to charge the jury as requested by the defense.

5. Prejudicial error occurred in the erroneous admission of certain evidence other than the hearsay statements of Eleanor Purvis.

6. In addition to these issues, appellant raised another question when he filed in this court a motion for augmentation of the record and an application for the production of additional evidence on appeal. He there sought to show that, by reason of certain official publications of the Adult Authority, which had come to his attention only after his motion for new trial had been denied, it appears that an employee of the Adult Authority, called as a witness by the prosecution, made a mistake in testifying as to what were the correct statistics compiled by that body. It is urged that such mistake went to the very essence of the evidence offered by the prosecution in proof of its contention that a person convicted of one murder, paroled, and convicted of another murder committed while on parole, will (if given a life sentence for the second murder) be again paroled within a period shown by such statistics. Counsel were notified that this court would not determine this motion and application separately from the appeal, but would consider it with the appeal. Appellant then included the point in his opening brief, and respondent replied to the issue, as if it were directly raised on the appeal. By that reply, respondent made a showing in opposition to appellant's contention on-the merits of the motion, but, in so doing, also pointed out that neither augmentation of the record, nor the taking of further evidence, is required because the publications involved are official publications of the State of California, of which we may take judicial notice. For that reason, the motion and application should be denied, and this contention will be treated as a sixth issue on this appeal.

*The Admission of the Hearsay Statements of Eleanor Purvis.*

At the trial, the prosecuting attorney was permitted to introduce, over objection, and in his arguments to discuss, many of the hearsay statements of Eleanor Purvis, the victim of the

1950 murder. Practically all of this hearsay is identical to that admitted on the second appeal in this case, and its admission held to be reversible and prejudicial error. The respondent claims, however, that the foundation for this hearsay offered in the instant trial, was different from that offered at the second trial, and is sufficient.

This hearsay was first mentioned in the opening statement made by the prosecutor. When this occurred, defense counsel asked for a conference out of the presence of the jury, which request was granted. He then pointed out to the court that, while it was too early to determine where the prosecutor's remarks would take him, he (defense counsel) wished to avoid error in advance, and felt that the statements could not be competent evidence under any theory. He claimed, correctly, that under the last *Purvis* decision hearsay evidence of Eleanor's statements and conduct were inadmissible if offered to prove her frame of mind.[1] He requested an offer of proof. The court refused to require such an offer, but during the discussion it became clear that the prosecutor intended to offer this hearsay as proof of adoptive admissions.[2] The defense counsel argued that the evidence was inadmissible even on that theory, because hearsay evidence of this type should not be admitted in a penalty trial because its inflammatory nature outweighs its probative value (citing the last *Purvis* decision, and also *People* v. *Love*, 53 Cal.2d 843, 856 [3 Cal.Rptr. 665, 350 P.2d 705], and *People* v. *Hamilton*, 55 Cal.2d 881 [13 Cal.Rptr. 649, 362 P.2d 473]). The court allowed the prosecuting attorney to include such statements and conduct in his opening statement. Then, at the trial, the deputy district attorney was allowed, over objection, to introduce the testimony of various police officers as to what Eleanor Purvis said and did, and how she appeared. He also urged this evidence, in his arguments to the jury, as proof of his contention that Purvis' conduct toward Eleanor was cruel and abusive. As foundation for this evidence the prosecutor produced several police officers who changed their testimony from that given on the former trial. There, some of them had

---

[1]It is now the law of the case that Eleanor's frame of mind is immaterial to the issues herein (*People* v. *Purvis, supra,* 56 Cal.2d 93, 97-99).

[2]In addition to holding Eleanor's frame of mind immaterial, we held in the last decision that hearsay evidence of her statements was not properly admitted to prove adoptive admissions for the dual reasons that there was no evidence to support a determination that defendant, if present, should have made reply, and no instructions were given to the jury on evaluating adoptive admissions.

testified that they did not know if Purvis was present when his wife made the statements. At the instant trial (in 1962) some of those officers testified that their present recollection of the events (which took place prior to 1950) was now better than it was when they testified (in 1960), and that they now recollected that Purvis was present during some of their conversations with Eleanor. Not all of the officers so testified, and none testified that Purvis was present during all of such conversations. Few, if any, could place Purvis' exact position in the group, nor state at what point in the conversation he entered or left the room. The testimony was elicited in such manner (often by leading questions) that it is impossible to ascertain which of Mrs. Purvis' various statements are alleged to have been made in Purvis' presence, and which were not.[3]

The credibility of those witnesses who had changed their stories was, of course, for the jury. On this appeal we must accept the testimony of those officers who testified that Purvis was present and failed to deny some of Eleanor's accusations. However, what was said in the last opinion (*People* v. *Purvis, supra,* 56 Cal.2d 93, 97) about this testimony is also here applicable: ''Even if he [defendant] were present [when such statements were made], 'Where his response is silence, evasion, or equivocation, it is for the trial court to determine in the first instance whether the accusation has been made under circumstances calling for a reply, whether the accused understood the statement, and whether his conduct or response was such as to give rise to an inference of acquiescence or guilty consciousness.' [Citing authorities.] There is no evidence that would support such a determination. Furthermore there were no instructions given to the jury on evaluating adoptive admissions.''[4] (See also *People* v. *Briggs,* 58 Cal.2d 385, 406-408 [24 Cal.Rptr. 417, 374 P.2d 257].)

It is undoubtedly true that, the officers' testimony being

---

[3] On several occasions defendant objected to this testimony on the ground that there was no foundation as to time, place or persons present, and the trial court overruled the objections, holding that such information could be obtained on cross-examination. In those instances wherein the testimony indicated Purvis' presence, the ruling of the trial court was correct. (See Draper, ''*Time, Place and Persons Present*'' (1960) 35 State Bar J. 697.)

[4] No such instruction was given or proffered in the instant case. Appellant claims that the trial court should have instructed on the doctrine of its own motion. Inasmuch as both prejudicial error and misconduct appear regardless of the failure to so instruct, the point need not be further discussed.

accepted, some of this hearsay testimony could come within the rule of adoptive admissions if not so inflammatory that prejudice from its admission outweighs its probative value. The testimony was substantially similar to that so criticized on the last appeal. Most of it purported to show that appellant had beaten, burned or kicked his wife, for whose murder he had previously been convicted. It can be and is argued that much of this testimony, even if it otherwise comes within the rule permitting the introduction of adoptive admissions, was so inflammatory as to be inadmissible under the rule announced in the *Love* and *Hamilton* cases, *supra*. It is not necessary, however, to consider each item of the challenged testimony, and the possible application of the rule of the cited cases, because at least three important items of this testimony were not admissible under any theory. ▪ Under the guise of proving adoptive admissions the prosecution offered and secured the admission of three facts that could only be relevant as to proof of the former victim's state of mind—evidence identical to that held to be inadmissible, and its admission held to be prejudicial, on the last appeal. Thus the police were allowed to testify that Eleanor did or did not desire to have Purvis arrested, varying with the different episodes, that she *looked* frightened or fearful, and that she went to the police station, not in his presence, to express her fears that he would kill her. None of these items, under any interpretation, could constitute an adoptive admission, and none was admissible on any other theory. To aggravate the error, the prosecuting attorney used each of these three items in his closing argument as proof of the fact of Purvis' brutality. Thus, the deputy district attorney was guilty of the very same misconduct for which he had been reversed on the last appeal in this case, and for the very same misconduct for which he had been reversed in *Hamilton, supra*. Such misconduct must be deemed to have been deliberate. Inasmuch as the assessment of appellant's character comprised a major part of the prosecutor's argument for demanding the death penalty, the prejudice is obvious.

*The Publication in the "Oakland Tribune."*

▪ This specification of error centers around the publication by the "Oakland Tribune," a paper of general circulation published in the county seat of Alameda County, where the case was tried, of an article quoting certain extrajudicial comments of H. P. Gleason, then the Sheriff of Alameda County. Gleason had not been a witness at the trial. Appel-

lant contends that the act of Gleason, in making the public statements about the pending trial, and of the prosecuting attorney in directing the attention of the jury to them, and of the trial court in not instructing the jury to disregard the statements in the paper, constituted prejudicial misconduct. We agree. These actions, in our opinion, deprived appellant of the fair and impartial trial to which he was entitled.

The facts are not in dispute. On Friday, May 11th, after nine-plus weeks of trial, defense counsel concluded his argument to the jury, and the trial was continued until Monday, May 14th, for the prosecution's closing argument. On Sunday, May 13th, the "Oakland Tribune" published what purported to be a symposium entitled "Crime and the Citizen—A Special Report." That article purported to report on a conference on law enforcement in which the sheriffs and police of the east bay counties had participated. The article gave no hint of when that conference took place. It was given great prominence by the paper. It occupied five columns (out of eight) at the top of the front page, headed by a four-column picture of the officials in session, *all* of the next page, and all of the third page except a small space used for advertising. No person who read the newspaper that Sunday could have overlooked it. It was obviously calculated to over-shadow the other news of the day.[5] On the first page, the article attributed the area's high crime rate, among other things, to "[a]n antiquated criminal code that sends a man to prison for second-degree murder for one year-to-life then frees him 18 months later." The succeeding pages gave prominence to certain statements made by Sheriff Gleason, supposedly dealing with the problems of the law enforcement agencies, but couched in language that not only referred specifically to the *Purvis* case, but which set forth that official's view of what should be done to prevent all possibility of another parole in that case. The sheriff attacked the Adult Authority for paroling prisoners who then repeat their crimes, and attacked the courts for what he termed "leniency." He also made the assertion that modern lenient sentences had no deterrent effect upon criminals. Specifically referring to this case, he was quoted as saying, "We are trying a case now that has been in our courts four years simply on the penalty that the fellow

---

[5]Including such matters as the United States fleet's intervention in Laos, commencement of the Northern California Construction Workers' strike, an arson slaying in Oakland, a midwest storm and a fatal air crash in Greenland.

was to receive. It's not guilt or innocence, simply the penalty. He has been sentenced twice to death and each time the higher courts in this state have overthrown it on a technicality. . . . This fellow . . . this Tommy Purvis, he has killed two women, one of them after he was paroled.'' Although the remarks of the other ''conferees'' were confined more or less to police problems, Gleason's remarks left no doubt that he recommended a death penalty for second murderers in general, and for Purvis in particular, since he was certain that no other punishment would prevent a reoccurrence.

On the following day (Monday, May 14th) the prosecutor started his closing argument. After a few preliminary remarks he made use of the ''Tribune'' article in the following manner:

''MR. VUKOTA [Prosecuting Attorney] : Should the defendant be treated lightly, a fellow that has murdered twice? *As we know*[6] [italics added], there was an article in the Oakland Tribune as of yesterday, and——

''THE COURT: Now, Counsel, there is no evidence in the case that there is an article in the Oakland Tribune.

''MR. HOOLEY [Defense Counsel] : May I have Your Honor cite this as misconduct?

''THE COURT: It is not misconduct because we don't know what the article says.

''MR. VUKOTA: Well, may I quote some authorities to the Court, that I will ask the Court to read, with reference to legitimate argument?''

Thereupon, although the court had ruled in his favor, the prosecutor read some 14 citations to which he added his personal interpretations indicating that his conduct was correct. Each such citation dealt with the propriety of arguing facts which were not in evidence when those facts were a portion of the general body of common knowledge.

''MR. HOOLEY: May I, Your Honor, cite this as misconduct?

''THE COURT: There is no question about this. But how could a newspaper that was written yesterday when the evidence closed Thursday or Wednesday be considered in evidence? Now, there is no question you can refer to matters that have been referred to in the trial. . . .

''MR. VUKOTA: They [referring to his citations] referred to the Alger Hiss case. I would like the Court to read it. It

---

[6]This was the first reference to the article in open court. It will be noted that the prosecutor assumes the jurors' knowledge of its existence.

states right in there they argued about the Alger Hiss case, and it wasn't even mentioned at the trial. In that case it is held that we can refer to facts of other cases and anything that is of—Let's see here, now. Here it is. . . . (Discussion off the record.)

"Mr. Vukota: May I proceed, Your Honor?

"The Court: Yes, go ahead, Counsel.

"Mr. Vukota: I believe I informed the Court as to the extent of my argument on this article. I have informed the Court just exactly what I was going to state.

"The Court: Not exactly. In general terms, yes.[7] . . . And without any reference to the Purvis case.

"Mr. Hooley: May I, Your Honor, interject an objection to the use of this article at all by the District Attorney in his argument on two grounds. One, it is improper argument on the basis of referring to something outside of the evidence. And, secondly, it is improper argument on the basis that it exceeds the scope of the argument of Counsel and therefore is not proper closing argument in that respect. And I ask that the remarks of the District Attorney previously addressed to the jury in relation to this article be stricken, that it be cited as misconduct and the jury admonished in that regard.[8]

"The Court: Well, the article to the extent it might contain any reference or facts of this case, I have talked to Counsel about it, and he is not going to go into that.[9]

"Mr. Vukota: Yes.

"The Court: *Now, matters of general knowledge and public notoriety that the article covers can be discussed by Counsel.* [Italics added.]

"Mr. Hooley: May I, Your Honor, reserve the right to a further motion to resist?

---

[7]The record fails to disclose whether the court and counsel are referring to the discussion off the record, or to some previous discussion at which the defense counsel may, or may not, have been present. See further references to this subject matter which indicate a private discussion between the court and the district attorney.

[8]An unstated objection to the use of the article is that it gives the jury the extrajudicial views of their elected sheriff on the basic issue in the case. However, such objection (as well as the second ground stated) was premature *if* defense counsel was not yet advised (as was the court) of the use which the prosecutor intended to make of the article. Be that as it may, no admonition, except the limited one hereafter mentioned, was given to the jury at any stage of the trial.

[9]Thus inferring, to such jurors who may not have seen it, that the article did, in fact, refer to the *Purvis* case. The importance of this must be kept in mind in connection with the manner in which the prosecution was allowed to use the article, and the court's remarks regarding "general knowledge and public notoriety."

"THE COURT: Yes.

"MR. HOOLEY: Thank you.

"MR. VUKOTA: Now, through all this furor the only thing I was going to mention out of this article, and I did mention it to His Honor, was the fact that there was a report in the Oakland Tribune yesterday entitled, 'Crime and the Citizen, A Special Report.' *And then there was stated remarks about the parole system which should in itself impress upon you jurors that those outside that are not part of this jury have their eyes focused upon you just to see what you are going to do with a man who has been convicted in a seven-year span of two murders.*[10] [Italics added.]

"MR. HOOLEY: I will object to this, Your Honor, on the basis of misconduct as though there were something directed by publicity or by something of that nature toward the jury. I believe it is prejudicial argument in that effect. I cite it as misconduct, and I ask the jury be admonished to disregard it and the remarks be stricken.

"MR. VUKOTA: May it be stated for the record I am not stating that in that article there are any remarks about the entire society of the State of California watching these fourteen jurors. This is my analysis of who is observing and what it was going to do for law enforcement. In other words, he is saying that I am inferring it is in the article, and that is not true.[11]

"THE COURT: *You are correct.* [Italics added.] This is actually a situation in which you have picked up, shall we say,

---

[10] Assuming that no juror had, as yet, seen the article, several elements of misconduct are inherent in this remark. The defects of the parole system being one of the prosecution's two principal bases for demanding the death penalty, it was misconduct to infer that the article contained material critical of that system. More important, the district attorney went beyond his promise (and the court's admonition) not to infer that the article referred to the *Purvis* case, inferring that the principals of the article (whoever they might be) were watching this particular jury. But, if it be assumed that the jury had already read the article, or might read it that night (*a thing which they were not advised not to do*), the misconduct was compounded by its indirect reference to the views of the sheriff.

[11] Mr. Vukota's original remark, the objection and the reply thereto should be analyzed as a unit. It then becomes clear that Vukota originally stated, *as a fact, and not as his analysis thereof*, that the article contained material which indicates that someone on the outside (unnamed) was watching this jury. Then, when the impropriety of the remark was called to the court's attention he (Vukota) replied by placing in the objector's mouth *phrases which neither the objector nor Vukota had used* (e.g., "the entire society of the State of California watching these fourteen jurors."). This allowed him to not only deny that he used such phrase, but to criticize the defense counsel for suggesting that he had.

you have used yesterday's newspaper to give you sort of a timely opening sentence for an argument.[12]

"Mr. Vukota: That is correct, Your Honor.

"The Court: *Rather than actually referring to the article in the paper at all.*[13] [Italics added.]

"Mr. Vukota: That is correct.

"The Court: Yes."

Whereupon, after addressing the jury in criticism of Mr. Hooley for having twisted his words, the district attorney turned to other portions of his argument. He consumed the balance of the day.

When the court recessed at noon no admonition was given the jury to refrain from reading the publication during the two-hour recess. During that recess the defense moved for a mistrial on the basis of what had occurred, as quoted above. The motion was denied, but the court allowed the defense to place in evidence (for identification, and not as evidence to go to the jury) the three sheets from the "Tribune," in order that this court might have the opportunity to review them. Of some importance in assessing the effect of that article are certain remarks made by the trial judge during the discussion of the motion for mistrial. After stating that "it certainly played no part in the trial," the judge referred to "the fact that Mr. Vukota has brought it up, either they have seen it now, yesterday, or they didn't, and his reference to it wouldn't change that at all." He was incorrect, of course, in his assumption that the district attorney's reference to the article would make no difference. By adopting the article as part of his case, with the approval of the court, the prosecutor placed the approval of officialdom upon what might otherwise be considered a mere newspaper article. In addition, the trial court's assumption overlooked the fact that the jury was to have two further opportunities to read the publication. Of greater importance, the trial court admitted the possibility of the jury having read the entire article, and although so requested by the defense, *the court failed to give the jury any admonition to disregard that which they might have read.* In fact, the court inferentially told them that everything con-

[12]In what respect was Mr. Vukota correct? In referring to the newspaper article in the first instance, in telling the jury that it contained information in regard to them, or in criticizing defense counsel for making a proper objection?

[13]The fact is that Vukota *did* refer to the actual article and its contents, *and that the jury was impliedly told that such procedure was proper.*

tained in that article, other than the name of the defendant, was within the field "of general knowledge and public notoriety." (Including, if they did happen to read the article, Sheriff Gleason's opinion of the Adult Authority and the need for executing two-time losers.) That the court was aware of the contents of the article is to be seen from the judge's next remark, wherein he purported to summarize the publication as stating "that the greatest cause of crime in this area, . . . [is] apparently the courts, the probation officer, the probation office, the Legislature, . . . [and isn't] caused by the Sheriff or the police." Following which he stated, "It is not an inflammatory article, anyway."

At 4:10 p.m. Mr. Vukota finished his closing argument, and the court recessed until the next morning, *again* sending the jury to their respective homes for the night. In addition to the usual admonition the court added the following:

"We have had mention here of newspapers, so I will again [*sic*] admonish you not to read anything in the newspapers concerning this case. You can do all of that after you have brought in your verdict."

The quoted language is not an admonition to refrain from reading the first three pages of the Sunday "Tribune." In fact, listening to that instruction in connection with what transpired earlier in the day, a reasonable juror could easily take it for an invitation to read the offending article before returning for deliberation. Nothing was said regarding the impropriety of reading the Sunday "Tribune's" article on "Crime and the Citizen"—the admonition was specifically limited to "anything in the newspapers concerning this case." All other newspaper articles and all other portions of this article remained open for the jurors' perusal. On at least two occasions during the day the judge had told the jury, in effect, that this particular article did not refer to the *Purvis* case. It consisted, he told them, of matters within their general knowledge and public notoriety. That was his reason for allowing the prosecution to mention it. Any reasonable, but curious, juror could justifiably return to his home that night, call for Sunday's "Oakland Tribune," and read the offensive article in its entirety, with a clear conscience, if, indeed, he had not already done so.

Moreover, it must be remembered that the trial judge had expressed the opinion that some jurors may have already read the article. In such a situation the trial judge should have taken steps to ascertain whether any jurors had, or had not,

in fact, read the article—and should have then admonished those who had read it to disregard it. But here, apparently, the trial judge believed it to be proper for the jury to be aware of its contents. In light of his statement that the article was not inflammatory, that it contained matters of public knowledge, his ruling that the prosecution might refer to it (including its assessment of the parole system), and the ambiguous wording of his single admonition, it is probable that he did not believe that perusal of the article by the jury would constitute error.

In appraising this problem, the following facts are uncontroverted:

(1) The sheriff of the county in which the trial was being held made public, but extrajudicial, assertions that (a) courts and Legislature are too lenient in providing penalties for crime, (b) the parole system is administered in such a manner that the convicted criminal is given an opportunity to repeat, (c) because of these facts minimum penalties cease to be a crime deterrent, (d) when two prior juries in this case rendered verdicts of the extreme penalty, those sentences were reversed on technicalities;

(2) Those remarks were given publicity in the county's leading newspaper in such manner that no reader of the paper could overlook them;

(3) Regardless of intent, the date of that publication was so timed that the jurors had an opportunity to read it on the last weekend of the trial, after all of the evidence was in, but prior to hearing the prosecutor's final argument;

(4) During his final argument the prosecutor called the panel's attention to that publication and, although he did not name the source or quote the statements, told the jury that it was an assessment of the parole system and that it indicated that those on the outside were watching them;

(5) Over defense objections the trial court approved of such action by the prosecuting attorney, stating (in the jury's presence) that the matters alluded to were not facts in this case, but were matters within the jury's "general knowledge and public notoriety";

(6) Although the trial judge believed that the jurors may have read the publication, he failed to admonish them to disregard its contents;

(7) When the jurors had a second opportunity to read the publication the trial judge gave no admonition, and, when they had a third opportunity he merely admonished them to

refrain from reading anything "concerning this case," leaving it to them to determine whether the offending publication was within such classification.

Appellant contends that it was prejudicial misconduct to thus call attention to the article. Respondent argues that neither the sheriff nor the prosecuting attorney was guilty of misconduct because the article was not inflammatory and that the prosecutor's reference thereto was merely "a passing comment."

The problem here involved is not similar, as contended by respondent, to the one involved where the claim is made that, because of the *pretrial* publication of inflammatory matter, the accused was denied a fair trial. In such cases it has been held that it is not error to deny a change of venue if, at the time of selecting the jury, the defense has either the opportunity to secure jurors who have not read the challenged publication, or who, having read it, assert that they have an open mind. (*People* v. *Duncan,* 53 Cal.2d 803 [3 Cal.Rptr. 351, 350 P.2d 103].) But it is error to deny such a change of venue when the publication is so inflammatory that the securing of 12 impartial jurors is practically impossible. (*People* v. *McKay,* 37 Cal.2d 792 [236 P.2d 145].) Respondent argues that the article was not of the inflammatory nature discussed in these cases. But the problem here involved is different from the one discussed by respondent. Here we are dealing with a jury that was already impaneled and had heard all of the testimony prior to publication of the article in question. Assuming that the article was seen and read by one or more such jurors, the question then is not whether the article was inflammatory but whether the jury was allowed to consider incompetent material. The authorities on which respondent relies are thus not in point (*Irvin* v. *Dowd,* 366 U.S. 717 [81 S.Ct. 1639, 6 L.Ed.2d 751]; *Janko* v. *United States,* 366 U.S. 716 [81 S.Ct. 1662, 6 L.Ed.2d 846]; *People* v. *Brommel,* 56 Cal.2d 629 [15 Cal.Rptr. 909, 364 P.2d 845]; and *People* v. *McKay, supra*).[14]

The respondent also argues that the sheriff only made "passing reference to appellant" that is "buried in the middle of a three-page article involving problems of law enforcement generally." But that characterization overlooks the

---

[14]However, much of the reasoning in those decisions sustains appellant's point of view herein. Thus, in the *Irvin* case, the United States Supreme Court, when referring to the bias which pretrial publication admittedly created in the minds of persons subsequently selected as

statements of the sheriff about the deterrent nature of punishment, the claimed maladministration of the Adult Authority, and the recidivistic activities of convicted murderers if they are not put to death. These all had direct relation to the problem then before the jurors. All were given prominence. Some were preceded by subheads, and others were repeated in special "boxes" at the top of their respective pages. These statements were prejudicial. █ Neither evidence nor argument regarding the deterrent nature of punishment may be presented to the jury on the penalty phase of a first degree murder case (*People* v. *Love,* 56 Cal.2d 720, 731 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809], overruling (to that extent) *People* v. *Friend,* 47 Cal.2d 749 [306 P.2d 463]).

█ The sheriff's remarks, appearing at the time and in the manner stated, could be taken by the jury as both evidence and argument. Moreover, the sheriff's remarks have to be considered in light of his official position. He is a county official, in a real sense part of the prosecution. His remarks were every bit as damaging as would be similar statements by the district attorney. It has consistently been held that the official position of the district attorney, as a representative of the People, carries such weight with a jury that his statements of fact predicated on his knowledge, rather than on the evidence, constitute reversible error. (See *People* v. *Lyons,* 47 Cal.2d 311, 318-319 [303 P.2d 329]; *People* v. *Talle,* 111 Cal.App.2d 650 [245 P.2d 633]; *People* v. *Pang Sui Lin,* 15 Cal.App. 260 [114 P. 582]; *People* v. *Pantages,* 212 Cal. 237 [297

jurors, said (at pp. 727-728 [6 L.Ed.2d at pp. 758-759), ''With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations. The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man. . . . No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. . . . As one of the jurors put it, 'You can't forget what you hear and see.' With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere'' uncharged with passion and prejudice. In the same case, the concurring opinion of Mr. Justice Frankfurter was devoted not only to the need for reversal, but also to the need for action against those who were responsible in obtaining a verdict in such manner. Therein (at p. 730 [6 L.Ed.2d at pp. 760-761]) he said, ''This Court has not yet decided that the fair administration of criminal justice must be subordinated to another safeguard of our constitutional system—freedom of the press, properly conceived. The Court has not yet decided that, while convictions must be reversed and miscarriages of justice result because the minds of jurors or potential jurors were poisoned, the poisoner is constitutionally protected in plying his trade.''

P. 890], and cases cited therein at pp. 246-249.) These remarks of the sheriff were presented to the reader (presumably the jury) without the safeguards of cross-examination or objection to competency.

The contention that reference to the challenged article was not misconduct is unsound. Respondent urges that the reference was but "a passing comment to the effect that a newspaper article had been published dealing with the problems of law enforcement and the parole system." If such was not intended to convey the impression that the parole system was undependable—and that therefore the jury had better prevent parole by providing the death penalty—it was without meaning. Furthermore, the contention disregards the fact that the "passing comment" threatened the jury with the statement that "those outside that are not part of this jury have their eyes focused upon you just to see what you are going to do. . . ." ▮ A warning of probable consequences of failure to convict, and of the unfavorable reactions of neighbors is improper (48 Cal.Jur.2d, Trial, § 439, p. 446).

▮ The respondent argues that the prosecuting attorney always has the right to refer to matters of common knowledge (citing *People* v. *Wein*, 50 Cal.2d 383 [326 P.2d 457], and *People* v. *Kynette*, 15 Cal.2d 731 [104 P.2d 794]). Here it falls into the same error of reasoning as did the trial judge. If this newspaper article is to be deemed a matter of common knowledge it would follow that such could be introduced into evidence without further foundation. Could this article have been so used? Are Sheriff Gleason's opinions matters of common knowledge? Are his statements about parole? About the deterrent nature of penalties? About repeated murders by persons on parole? All of these matters were called to the attention of the jury by the prosecuting attorney when he induced the trial court to hold that the publication was a matter of common knowledge. The misconduct, the error and the prejudicial effect must be judged by what occurred. To call the article to the attention of the jury was misconduct. To inferentially authorize the jury to read it was prejudicial error.

*Alleged Misconduct of the Prosecuting Attorney.*

▮ Appellant next cites several instances of other alleged misconduct of the prosecuting attorney. Thus, appellant contends that the prosecutor was guilty of deliberate misconduct when, during his arguments to the jury, he misquoted his many psychiatric witnesses as having testified that the de-

fendant had actually formed the deliberate intent to kill, whereas in fact those witnesses had only testified that defendant was capable of such intent. Respondent argues that in making such arguments the prosecutor was only presenting the aspects of the case favorable to his side in as vigorous a manner as possible. Such an argument does not excuse either deliberate or mistaken misstatements of fact. In the situation under discussion the misstatement would seem to have been deliberate. In almost each instance (there were several such witnesses) the prosecuting attorney asked a leading question in which he assumed the witness to have found deliberate premeditation. Before objection could be made, such witness corrected the examiner by stating that he would have no way of knowing what the defendant did at a time when he (the witness) was not present, but that from his examination he was of the opinion that the defendant was capable of forming such intent. But the cited argument, although misconduct, was not objected to. Its effect could have been eradicated by an admonition had such objection been made. Therefore, the point may not be raised on appeal (*People* v. *Brice,* 49 Cal.2d 434, 437 [317 P.2d 961]; *People* v. *Jackson,* 59 Cal.2d 375, 381 [29 Cal.Rptr. 505, 379 P.2d 937]). A repetition of such conduct should not occur on another trial.

 Appellant further contends that the prosecuting attorney was guilty of misconduct in stating to the jury that defense counsel believed his client deserved the death penalty. When immediate objection was made, the prosecuting attorney replied that he was not making a factual statement of defense counsel's frame of mind, but was stating his analysis of the defense arguments. Although the court admonished the jury to disregard the remark, the prosecutor continued to address the jury on his reasons for having made the remark, thus continuing the effect of his conduct in spite of the admonition. The respondent concedes that the original statement was misconduct, but argues that the further explanation, made after the court's admonition, had the effect of "minimizing, if not eliminating, any possible prejudice." When the record of this transaction is read in context it does not appear to have had an important bearing on the trial as a whole. It is just another example of a course of conduct which should not be condoned.

 Another citation of misconduct involves an attack on part of the prosecuting attorney's opening statement. It is claimed that the prosecutor deliberately, and with knowledge

that he could offer no evidence thereon, told the jury that defendant was "involved in a knifing" incident in the State of Washington. Since the Attorney General urges only that the matter was not prejudicial (and admits the alleged misconduct by failure to refute it), the point that it is misconduct does not require discussion. But, the facts in reference to this incident illustrate a type of misconduct that permeates the record, that is, the ability of the prosecutor to make his own misconduct appear to be the fault of the defense counsel. Thus, in his opening statement, the prosecutor stated:

"MR. VUKOTA: Now, before and during the marriage to the victim while they resided in Washington, the defendant had numerous arrests for drunkenness, fighting, car-clouting.

"MR. HOOLEY: Your Honor, I hesitate to interfere with any opening statement on the basis of being argumentative, but I believe this opening statement is, with reference to the word 'numerous' insofar as this so-called fighting and car-clouting is concerned, argumentative.

"MR. VUKOTA: Let's forget the word 'numerous' if that bothers him, the numerous arrests.

"Mr. Hooley: It does.

"THE COURT: I think this will probably come up several times.

"I will admonish the jury that the statements of counsel are not evidence and are not to be considered by you as evidence in your deliberations, but they are only a statement of what they intend to prove by the evidence.

"So you are not to be guided in your deliberations by these statements of counsel. So, we will ask you to disregard the use of the word 'numerous,' and I will strike that word from the statement.

"MR. VUKOTA: For the purpose of the record, when I use the word 'numerous,' I always consider anything over one as being numerous.

"Now, evidently, it is going to be a quibble on words, but this isn't what we are here for. You are here to listen to the facts and determine what transpired, whether I use the words 'numerous,' 'various,' or otherwise.

"MR. HOOLEY: I object to that, Your Honor, and ask that the jury be admonished that such remarks are not properly a part of the opening statement.

"If the District Attorney is arguing his case now it would be proper argument, but at the present time it is not a proper part of the opening statement.

"Mr. Vukota: This is explaining why the words 'numerous' and 'various' are not being used.

"The Court: Yes, there is no objection to him explaining the use of the words.

"Mr. Vukota: I will use the word 'Arrests.' That is plural. Whether you consider it one or many, I don't care, but I will use the word 'arrests' for drunk.

"There were about four or five arrests for being drunk, there is a car-clotting [sic], that is getting into a car and taking something out without anyone's permission, if the car doesn't belong to you.

"He was involved in a knifing, and then he decides to leave the State of Washington.

"Mr. Hooley: Your Honor, again, I ask, because of that statement, which is, I think, inflammatory in its nature and not in accord with any of the facts that Mr. Vukota will be able to present, the facts as they exist, 'involved in a knifing,' which I think is completely apart from the proof that I think is expected in this case, I ask again that the jury be admonished and that the jury be instructed to disregard the statement.

"Mr. Vukota: Before the Court asks the jury to disregard that statement, I am willing to give the Court the transcript of 1958 and the transcript of 1960 to see whether or not that particular fact was proved or not proved in 1950 and the statements that were made.

"Now, whether or not it is admissible in this particular case depends on how the Court is going to rule, but I will take the 1950 transcript, and I can't think of the page, it is about eight volumes, but I am willing to show it to the Court that this is done in good faith.

"The Court: Now, just a minute, counsel. Is your objection the fact that there will not be any evidence of a knifing or ——

"Mr. Hooley: My objection, Your Honor, is that there will be, and I anticipate, testimony along this nature.

"Mr. Vukota: Well, then, why are we arguing about it?

"Mr. Hooley: Because I think the way you use it is inflammatory, and that is my objection.

"And at this time it places a wrongful interpretation upon an incident which I anticipate he will attempt to prove, but the use of the words 'involved in a knifing' carries with it a prejudicial and inflammatory statement that I believe is not a

part of the evidence that he would bring into this case. It is a highly inflammatory statement as he phrased it.

"MR. VUKOTA: Well, I won't withdraw the word 'involved,' because when there are two or more persons I don't know how you will explain it to the jury.

"THE COURT: Counsel, I can't argue with you because I don't know what you are going to present, so I don't know whether the defendant was involved in a knifing or wasn't involved in a knifing.

"MR. VUKOTA: That is correct, Your Honor, you do not know that.

"THE COURT: So, it is up to you. Now, you are offering this, so it is up to you to prove it.

"MR. VUKOTA: Now, wait a minute now.

"THE COURT: Or offer testimony on it.

"MR. VUKOTA: As I said originally, and the Court has instructed the jury, this is not to be considered as evidence in the case. There will be an offer made based on a knifing."

The Attorney General does not deny the assertion that the facts in reference to this incident could not be proved and that the record on the two previous appeals showed that this was so, but limits himself to the assertion that all prejudice was cured by the admonition of court to the effect that statements of counsel are not evidence. Of course, such statements of fact, followed by no offer of proof, constituted misconduct. (*People v. Perez*, 58 Cal.2d 229 [23 Cal.Rptr. 569, 373 P.2d 617].) In the present case the prosecuting attorney was told by the court that he had better not state that which he could not prove. Nevertheless the statement was thereafter repeated. If prejudice of this type of misconduct may be removed in the manner suggested, reversal could never be predicated on the most deliberate misstatement of fact in an opening statement. Here the challenged statement was not inadvertent. The misconduct here referred to was identical to that of which the same deputy district attorney was guilty on the previous trials of this matter, and which was instrumental in the reversal. In such former trials the prosecutor's absolute statements of fact might be excused on the basis that he attempted to prove the same, only to be subsequently met with our decision that the method of proof was incompetent. In the present situation he has no such excuse, and his bad faith requires reversal (*People v. Lyons, supra,* 47 Cal.2d 311, 318-319).

■ Misconduct is also claimed because the record shows that one Bernard, an investigator for the district attorney, who sat with the deputy at the trial (and was used on the stand to represent witnesses when testimony from prior proceedings was read into evidence) and so known to the jury as a part of the prosecution, talked to members of the jury on several occasions. There is a factual dispute as to whether some of those remarks were intended for the jury, or were indiscreetly made to others in the presence of the jury under such circumstances that the jury might have thought themselves to be addressed. Even if the latter fact be true, the remarks were intended to be facetious, and at defendant's expense. And, it is admitted that on at least one occasion Bernard took it upon himself to explain an unimportant fact to the jury. Respondent admits the impropriety of Bernard's actions, but reasons that none of his remarks had any bearing upon any matter which the jury was to decide. That may be true, but respondent does not deny the obvious fact that informal communication between an employee of the prosecution and the jury tends to create a rapport between the two, of which the jury may be unconscious, but which may yet affect their deliberation. This type of conduct should not be condoned.

Appellant cites many other examples of alleged misconduct, some of which were objected to, and some of which were not. These assignments comprise various misstatements of both law and evidence in regard to each of which the prosecuting attorney offered the excuse that he was only indulging in inferences that the jurors could make for themselves. Examples include the argument that the psychiatric witnesses testified that defendant if released will kill again (when, in fact, they testified that if faced with the same circumstances he *might* kill again), argument that the testimony of the police was that a certain door was closed (when, in fact, one officer so testified and his partner testified to the opposite), argument that the testimony of one Mrs. List was that she heard Purvis threaten his wife, Eleanor, just prior to shooting her (when, in fact, the logical inference to be drawn from the testimony was that she heard Eleanor make the threat), an erroneous argument as to the law regarding the death penalty and the jury's function in regard thereto. That argument was intended to convince the jury that the Legislature, and not the jury, was responsible for fixing the death penalty in this case, and as such approached the error discussed in *People* v. *Friend,*

*supra,* 47 Cal.2d 749, at page 756. Except for the last mentioned, each such specification refers to a relatively unimportant misstatement of fact or law, and all might reasonably be excused as an attempt to draw the most favorable inference. Furthermore, most were cured by timely admonition, and none, standing alone, would create such prejudice as would require reversal. The total record, however, shows a pattern indicating a disdain for the admonitions of the trial court,[15] a practice of disparaging the opposing counsel,[16] and a determination to get before the jury that which the prosecuting attorney desired them to hear, regardless of the law on the subject. In few instances did he accept the ruling of the trial court without argument, during which he expertly turned the tables on his opponent. And in those cases wherein his argument failed, and the trial court gave an admonition, he seldom let the matter rest there, but followed with an ''explanation'' which allowed him the last word on the subject. Not once during the trial did the trial court even comment on the prosecuting attorney's practice of following every admonition by an explanation.

*Refusal to Give Certain Proffered Instructions.*

■ Appellant claims error in the refusal of the court to give certain instructions proffered by him. Several of them were repetitive, others were argumentative, while others embodied doctrines announced only in dissenting or special concurring opinions of this court. The refusal to give the proffered instructions was not error.

*Assignments of Error as to Admission of Evidence.*

■ These assignments are only of minor importance. One involves questions that Dr. Schmidt, prison psychiatrist, was permitted to answer, over objection, on cross-examina-

[15]On an occasion when the court was called upon to admonish the jury to disregard one of his remarks, Mr. Vukota followed that admonition with the statement, ''If they want that admonition they can have it.'' Respondent argues that the remark should be interpreted to indicate an acknowledgement that the admonition was proper. If so, it is a novel theory that the trial court's rulings, made in the presence of the jury, require the spoken approval of the district attorney.

[16]Example: When asked by the court if he wished to reply to an objection by defense counsel, his answer was, ''He hasn't said anything yet, Your Honor. All he has done is give some idle vaporings here.''

Example: When defense counsel asked permission of the court to interrupt examination of a prosecution witness in order to examine him on *voir dire* (for the stated purpose of avoiding the necessity of a subsequent motion to strike), Mr. Vukota's interjection was, ''You can cross-examine him. I thought that was the purpose of cross-examination. You have been here for nine weeks and don't realize that yet?''

tion. Dr. Schmidt had recommended Purvis' parole from his first murder conviction. On direct, as a witness for the defense, he testified that, under all the circumstances now known to him, if Purvis were to receive a life sentence in the instant case, it is extremely unlikely that he would be paroled again. He also gave some testimony about recidivists and parole, generally. The questions and answers on direct are ambiguous. They do not make it clear whether Dr. Schmidt meant that a known recidivist (whatever his prior or subsequent crimes may be) is not likely to be paroled a second time, or whether his answers were limited to a two-time murderer. Over defense objections, the trial court permitted the prosecutor to ask the doctor questions designed to show that certain offenders who had been convicted more than once for the same offense, had, in fact been paroled for the second time. The questions on cross-examination were not limited to cases where the prior and subsequent offenses were murder. The objection was based on the holding in the first *Purvis* decision (*People* v. *Purvis, supra,* 52 Cal.2d 871, 885), to the effect that questions intended to bring out isolated examples of persons who had once been paroled and then committed a second offense but where the prior offense was not murder were improper because irrelevant and immaterial. It is true that the questions here involved were similar to those involved in the first *Purvis* case, but there the questions were asked on direct while here they were asked on cross-examination in an attempt to impeach the doctor. Had the questions asked the doctor on direct been strictly and carefully limited to the possibility of a two-time murderer being paroled, the propriety of the cross-examination would be doubtful. But they were not—at least they were ambiguous. Thus the cross-examination was proper.

Appellant next contends it was error to allow the prosecution to read into evidence the testimony of certain witnesses who had testified at the previous trials but who had refused to come from the State of Washington to testify at this trial. Appellant admits that the trial court has discretion in such cases, and concedes that the prosecution made a proper showing, but urges that the trial court abused its discretion because the testimony was too remote. The point is not well taken. It is true that the testimony concerned facts which took place between 1926 and 1929 (30 years before the murder for which defendant was being tried, and 35 years before the trial) but the prosecution was attempting to show a pattern

of conduct which commenced in defendant's youth and continued without interruption until the present time. Thus, this testimony was not objectionable on the ground of remoteness.

 It is also contended that the court erred in allowing the prosecution to impeach Thos. Purvis, Jr., by showing prior acts of hostility by him towards members of the family of Mrs. Wilson (defendant's victim). Purvis, Jr., had testified on behalf of his father at the previous trial, and at this trial (he being dead) the defense was allowed to read his prior testimony to the jury. The testimony of his hostility towards the victim's son was offered in impeachment, and for the purpose of showing a motive for his direct testimony. The point is unimportant, and not well taken.

*The Error in the Statistics Produced by the Prosecution.*

 This error was called to our attention on the motion to take additional evidence, but, for reasons already stated we have decided to treat it as a point on appeal.

Appellant claims, and the respondent inferentially admits, that there were serious errors in the parole statistics produced by the prosecution. It is urged that by these incorrect statistics the jury was given false evidence in support of respondent's contention that appellant, if given a life term, might be expected to be paroled in a stated time. Appellant and his counsel claim to have been unaware of the existence of the official documents containing the data now used to prove the testimony was in error until after the motion for a new trial was denied. While respondent denies that statement,[17] it is conceded that in any event this court may take judicial notice of the documents.

The facts giving rise to the problem are as follows.

Joseph Spangler, Chief Staff Officer of the California Adult Authority, was called by the prosecution to testify to the statistics of the Adult Authority in connection with parole of prisoners under life sentence for first degree murder. The gist of his testimony was that during the past 15 years the median time served on a life sentence for first de-

---

[17]Respondent contends that it can show that the defense, at all times here pertinent, was in possession of the documents in question and therefore should not now be permitted to show the facts. If this contention be true, it is probably true that the prosecution also had these official publications. If possession is equivalent to knowledge then the prosecution produced false testimony in a deliberate attempt to mislead the jury. We prefer to believe that although the documents were in existence, neither side appreciated the relevance of some of the statistics to this case, and that both sides were ignorant of the facts shown by such statistics.

gree murder, before parole, was between 10 and 11 years. He did not testify from any official publication of statistics, but from informal sheets which, he stated, had been prepared under his direction and contained the information pertinent to his testimony. He stated definitely that although the Authority kept statistics which differentiated by offense, first parole, and repeated parole, there were no statistics specifically designed to indicate the average time served by a person convicted of second degree murder, paroled, and subsequently convicted of first degree murder. *He further testified that his statistics included such cases along with the balance of prisoners who, paroled after conviction on some other crime, were convicted of murder committed while on parole.*

By analysis of two publications of the Adult Authority (which appellant has produced for our benefit, but which Mr. Spangler did not bring to court) and by virtue of mathematical computations based thereon, appellant arrives at the conclusion that the statistics used by Mr. Spangler specifically exclude prisoners serving a second sentence for murder committed after parole from a prior murder sentence. There is no claim that the error was intentional. It should also be noted that the reasoning of appellant is based upon statistical computations which are somewhat difficult to follow, but appear to be reasonable, and respondent does not deny the propriety of the conclusion. The result is that the testimony of Mr. Spangler pertains only to parolees who are in no way comparable to appellant, and hence his entire testimony was immaterial under the rule announced in the first *Purvis* decision (*People* v. *Purvis, supra,* 52 Cal.2d 871, 885).

But it is not upon the grounds of immateriality or incompetency that appellant places his main argument, but upon the argument and use made of these statistics by the prosecutor. Appellant correctly states our previous holding that the error in admitting the records of the Adult Authority there involved was compounded by the ''prosecuting attorney's use of them in his argument to the jury to disparage the operation of the Adult Authority. . . .'' (*Idem,* p. 886, citing several authorities.) In this, the third trial of the same case, this same prosecuting attorney went beyond the arguments formerly criticized. He first adopted the *average* time before parole— as testified to by Spangler—as the *fact* and probability of what would occur if the jury returned a verdict of life imprisonment. He cast disparagement on the testimony of Warden Duffy (a member of the Authority, called as a witness by the

defense) inferring that Duffy did not know whereof he spoke when he testified that the members of the Authority sometimes spend all day in an attempt to evaluate a case, and sometimes took the records home with them. He argued that "Mr. Spangler, the man that controls, sets up the time, [and] said 'Fifteen minutes, and in some cases forty.' Now, who do you believe? Is there any more honest, able man than Mr. Spangler? He has statistics to go by. That is why he was brought here, *to show you that Mr. Duffy is wrong.*" (Italics added.) Then he went on to attack the composition of the Adult Authority, calling attention to the fact that the various psychiatrists who testified on behalf of the prosecution were not members. At another point he scoffed at the Authority's stated policy of protecting society, and called its members "sociologists and sympathisers" who give "15 minutes or maybe 40 minutes at a hearing to determine whether *this man* should be returned to society," when it took nine weeks of testimony to give the jury his background. (Italics added.) Referring to what the Adult Authority does with persons given a life sentence, he stated, "Well, murderers are just pushed out." Such arguments, that attempt to "try" the Adult Authority on the penalty trial, were disapproved in *People* v. *Terry,* 57 Cal.2d 538, 567 [21 Cal.Rptr. 185, 370 P.2d 985]. Then, in his closing argument, he insisted on the accuracy of the statistics produced by Spangler—the very statistics now known to be in error. He stated: "although he [Purvis] has murdered twice, he [Spangler] has considered first degree commitments, murder first degree with life. *And there was no one hiding any records because Mr. Spangler stated that they have no records that show whether or not the individual that has been paroled for murder first degree commitment had any prior murder convictions, that would be murder second degree or any other prior felonies whatever.* He said they don't keep records like that. Now that is why I examined him as to those facts. ... *We brought all the statistics with reference to murder first.*" (Italics added.)

These arguments, independent of the error in the statistics, constitute a repetition of the very misconduct of this very same prosecutor that resulted in the two prior reversals. They constituted misconduct of a most serious nature, which was aggravated because of the error in the statistics. The error is not likely to recur on a retrial.[18] The misconduct should not.

---

[18]The use of statistics prepared by the Adult Authority, such as those here involved, may be open to serious question. We have heretofore ruled

In connection with the other errors, this error and misconduct require a reversal.

This is the third reversal in this case. A retrial of the penalty issue is necessary. This is particularly unfortunate in this case because it has already been finally determined that Purvis is guilty of murder in the first degree, and the circumstances of that murder are such that a jury would be justified in imposing the death penalty. But as guilty as Purvis may be, he is entitled to have the question of whether he should be given life imprisonment or the death penalty determined by a jury without the introduction of erroneous evidence and without misconduct aimed at influencing the jury by the prosecution. Here erroneous evidence was admitted, and the prosecutor was guilty of acts of misconduct, that at least once, and sometimes twice in this very case, have been held to be prejudicially erroneous. Under such circumstances the misconduct must have been deliberate and intentional. Certainly, such misconduct directly related to the only issue before the jury. Certainly, it was calculated to and we must presume did adversely affect the jury in its deliberations. Certainly, it is reasonably possible that such errors may and could have tipped the scales against defendant. Such errors, therefore, must be held to have been prejudicial. (*People* v. *Hamilton,* 55 Cal.2d 881, 900 [13 Cal.Rptr. 649, 362 P.2d 473].)

The motion to produce additional evidence is denied. The judgment imposing the death penalty is again reversed, and

that evidence of the "minimum, median and maximum terms of imprisonment actually served for first degree murder" is admissible (*People* v. *Friend, supra,* 47 Cal.2d 749, 755; *People* v. *Green,* 47 Cal.2d 209, 217 [302 P.2d 307]), and have approved the use of statistics to prove those facts. But we have not heretofore been called upon to pass on the reliability of the statistics tendered to prove the otherwise relevant fact in question.

By the use of such statistics a median time is arrived at for the parole of life termers, and then it is argued that the defendant in question will probably be paroled in that median time. If such statistics include all of the basic facts involved they would be relevant and material. But there is grave doubt that they do. Such statistics prepared by the Adult Authority (at least those we have observed) apply only to life termers that have been "released" by parole, by reduction of sentence, by court order, or by death, separated into those four categories. No set of statistics presented to us includes the time being served by those still confined under a life sentence and not released. This is to be expected, because statistics intended to show the average time served before release can only include those released. If any significant number of life termers are never released, except by death, that fact is not reflected in statistics purporting to show the average time served by life termers that have been released. Thus there may be a serious question presented as to the reliability of such statistics to prove the fact under discussion.

the cause remanded for retrial of the issue of penalty, and for the pronouncement of a new sentence and judgment as provided by law.

Gibson, C. J., Traynor, J., Tobriner, J., and Peek, J., concurred.

McCOMB, J.—I dissent. In my opinion the mandatory provisions of article VI, section 4½, of the California Constitution are here applicable, to wit, that *no judgment shall* be set aside in any case on the ground of (a) misdirection of the jury, (b) improper admission or rejection of evidence, (c) error as to any matter of pleading, or (d) error as to any matter of procedure, unless after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.

The majority reverse the judgment, because (in their language) "it is reasonably possible that such errors *may and could have* tipped the scales against defendant. Such errors, therefore, *must* be held to have been prejudicial." (Italics added.)

I *must* refrain from joining the majority in reversal, because I *cannot* say "after an examination of the entire cause, including the evidence ... [that I *am*] of the opinion that the error[s] complained of ... [*have*] resulted in a miscarriage of justice."

Schauer, J., concurred.

Respondent's petition for a rehearing was denied September 18, 1963. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.